FILED by _T_φ_)___ D.C.

**NOV 0 7 2012**

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – FT. LAUD.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE No.:

ALLEN LICHT

*Plaintiff*

**v.**

AJENE WATSON, JAMES GIBBS, ERIC L. NOVESHEN, YISROEL A. BORNSTEIN, ARYEH GOLDSTEIN, SAMUEL H. EISENBERG, THERESA LEE FREY, JEFFREY E. STALLER, CURT KRAMER, DAVID E. PRICE, TOMER TAL, STEVEN KOIFMAN, SCOTT H. WILDING, MONICA CHUI-TIRU, AJENE WATSON, LLC a Florida Limited Liability Company, ENVISION CAPITAL, LLC a Florida Limited Liability Company, SCB & ASSOCIATES, LLC a New Jersey Limited Liability Company, THE TRIPOD GROUP, LLC a Wisconsin Limited Liability Company, VIRMMAC, LLC a Michigan Limited Liability Company, HERITAGE CORPORATE SERVICES, INC. a Florida Corporation, ASHER ENTERPRISES, INC. a Delaware Corporation, STOCK STREET CAPITAL, LLC a Florida Limited Liability Company, and SKYLINE CAPITAL INVESTMENTS, INC. a Florida Corporation,

*Defendants*

## COMPLAINT

### NATURE OF THE ACTION

1.     Plaintiff's claims arise from the massive "pump-and-dump"[1] scheme perpetrated by Ajene Watson ("Watson") individually, and through his corporation -

---

[1] According to U.S. Securities and Exchange Commission, "pump-and-dump" are the ". . . schemes, also known as "hype and dump manipulation," involve the touting of a company's stock (typically microcap companies) through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market." See: http://www.sec.gov/answers/pumpdump.htm.

- Ajene Watson, LLC -- that was specifically formed for fraudulent activities and as an alter ego of Watson. Watson, in conspiracy with other Defendants, stole and misappropriated millions of dollars for personal enrichment and hundreds more to perpetuate the scheme.

2.    Watson did not act alone. Watson deployed a web of individuals, companies, and attorneys throughout the United States. In tandem, these companies and individuals participated and profited with Watson in the "pump-and-dump" scheme. These individual and companies participated with Watson in what was effectively one integrated and coordinated operation. Many of these corporations had no offices, employees, or existence, aside from corporate form and some temporary or Post Office Box address.

3.    To maintain the deception Defendants, and their associates used prominent (but temporary) Wall Street and other addresses and promoted themselves as sophisticated management and accredited financial services companies.  However, instead of helping unsuspecting companies, Defendants simply sought to defraud the client-companies and the client-companies' employees.

4.    To facilitate the scheme, the Defendants used attorneys for its stock acquisition transactions. These attorneys issued many opinion letters to stock transfer agent for Simulated whose stock these Defendants purchased. The letters were required by Defendants to obtain the stock without restrictive legend on the stock certificates, which allowed them to easily sell the shares to the public, in the open markets.

5.      These attorneys played a necessary and substantial role in Watson's scheme, and thus also violated the securities laws.

6.      Plaintiff and hundreds of other investors were duped by the Defendants and suffered damages.

7.      As direct consequence of Defendants' actions, Simulated was reduced to marginal business activity; it lost the trust of its business associates, its product re-sellers, and investors. Plaintiff Licht, as well as other management, have suffered damages because the debt-laden Simulated could no longer obtain necessary funding; the reduced business activity, coupled with outrage from injured investors, prevented Simulated, Licht and other management to obtain needed financing to continue operations and fund the payroll obligations; furthermore, Defendants actions impugned Plaintiff's integrity with broad business community and caused defamation to Plaintiff and others.

8.      Documentary evidence uncovered by Plaintiff shows that Defendants' conduct is not isolated to this matter alone. Various filings with SEC proffer repeated pattern of Defendants' similar activity. Documentary evidence shows that the Defendants involvement leaves the trail of decimated companies, injured management, and injured investors.

9.      Through the activities alleged in this Complaint, all Defendants participated in violation of, among others, Racketeering Influenced and Corrupt Organizations Act (RICO), violations of the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] and Section 10(b) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]. Furthermore, Defendants and the Defendant Companies violated the registration provisions of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a) and (c)].

### Watson Group Defendants Wrongful Conduct

10.   As set forth below, Watson was the chief mastermind of the scheme.

11.   The Watson Group Defendants are Watson, Gibbs, Noveshen, Bornstein, Chui-Tiru, Watson LLC, SCB, and Envison.

12.   Watson and his associates have organized and orchestrated the scheme.

13.   Watson Group served as the manager, controller, and illegal distributor (unregistered broker or eligible to be registered) of Simulated's stock to the selling Defendants and public market.

14.   Neither Watson nor any of the members of Watson Group are registered broker-dealers.

### Tripod, Asher, StockStreet, Skyline, Goldstein, Eisenberg, Kramer, Koifman, and Wilding Defendants Wrongful Conduct

15.   These Defendants have participated in the "pump-and-dump" scheme with Watson Defendants and were assisted by Attorney Defendants.

16.   Instead of legally investing into companies, these Defendants routinely received deeply discounted stock and immediately sold the securities on the open market for substantial personal enrichment.

17.    These Defendants assisted Watson in illegally obtaining hundreds of millions deeply discounted securities of Simulated. Among many other transactions, Defendants assisted with illegal issuance of 100,000,000  (one hundred million) Simulated's shares, which were then transferred from Watson back to these Defendants and dumped on the open market.

18.    These Defendants maintain multiple stock-trading accounts and operate their own unregistered "stockbrokerage" services that permit rapid sell-off, short-selling, and other stock-related machinations.

19.    In doing so, these Defendants circumvented the registration process and acted as a conduit to dump shares of micro-cap companies on the public markets and unsuspecting investors.

20.    While representing themselves as accredited investors, these Defendants are not accredited; they routinely engage in a lucrative "run-around" of an important disclosure policy underlying the securities laws.

## Virmmac, Herritage, Frey, and Staller Defendants Wrongful Conduct

21.    These Defendants have illegally profited from the "pump-and-dump" scheme by providing inflated and inaccurate information to the outside investors and serving as conduits to dissemination of press releases and inaccurate information.

22.    Defendants Frey and Staller have regularly conspired with Watson Defendants and produced inaccurate and inflammatory press releases and web posts.

23.     Defendants Frey and Staller have repeatedly ignored the red flags surrounding Watson and others, and played an important role in dissemination of inaccurate information.

**Attorney Defendants Wrongful Conduct**

24.     Defendants Tal and Price were the outside council for stock acquisition transactions by all Defendants.

25.     Attorney Defendants issued multiple Opinion Letters to facilitate removal of restrictive legend from stock certificates as well as assisted in transfer of stock, in general.

26.     Attorney Defendants knew that the Defendants intended to dump the shares immediately and without appropriate registration required by the provisions of Section 5 of the Securities Act and/or Florida State Law.

27.     Attorney Defendants pretended to serve the interests of Simulated and the Plaintiff. However, the services of these attorneys were retained and paid for by other Defendants for their personal gain.

28.     By issuing Opinion Letters which facilitated improper lifting of restrictions from the stock certificates, these Attorneys aided and abetted other Defendants in the scheme, as well as directly participated in conspiracy and scheme to defraud Plaintiff and others.

29.     Attorney Defendants participated in and facilitated multiple strategy sessions designed to circumvent the registration process and permit the Defendants dumping of the securities.

30.     Attorney Defendants facilitate and engaged in a sophisticated "run-around" of an important disclosure policy, Rule 144 of the Securities Act [17 C.F.R. 230], underlying the securities laws.

**PARTIES**

**A.     PLAINTIFF**

31.     Plaintiff, Allen Licht ("LICHT") is a resident of Florida. At all times relevant to this complaint, Licht was the Managing Director and Chief Operations Officer of Simulated Environment Concept, Inc. ("SIMULATED").

**B.     DEFENDANTS**

32.     Defendant Ajene Watson, a/k/a Ajene Odeluga ("WATSON") is a natural person residing at 150 W. 179th St, Apt 6A, Bronx, NY 10453. Watson is a Managing Member of Ajene Watson, LLC.

The "pump-and-dump" scheme outlined in this complaint is not his first. In addition to Simulated (traded under the symbol SMEV), Watson was or is involved in eDoorways, a Texas company, trading under symbol EDWY; UC Hub Group, Inc., a California company, trading under the symbol UCHB; Oriens Travel and Hotel Management Corporation, a Nevada company, trading under the symbol OTHM.

33.     Defendant, AJENE WATSON, LLC ("WATSON LLC") is a Florida limited liability company with its registered address at Defendant Gibbs home located at 1880 Lorenzo Lane, Oviedo, FL 32765. On information and belief, WATSON LLC was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Watson's liabilities, and for the purposes of

receiving payments on his behalf. Lacking a business purpose or independent will of any sort, WATSON LLC served as an alter ego to WATSON, completely beholden to his will.

34.    Defendant JAMES GIBBS ("GIBBS"), is a natural person residing at 1880 Lorenzo Lane, Oviedo, FL 32765. Gibbs is a Registered Agent of WATSON LLC. On information and belief, Gibbs was employed, at all times relevant to this complaint, by Watson and, among other duties, acted as a liaison between Watson and the Transfer Agent, American Registrar & Transfer Company.

35.    Defendant Eric L. Noveshen ("NOVESHEN"), is a natural person residing at 508 Coconut Isle Drive, Ft. Lauderdale, FL 33301. On information and belief, at all times relevant to this complaint, Noveshen is associated with Watson and acted as a liaison between Watson and the Defendant Price. Among other duties, Noveshen acted as "the-man-on-the-ground" in Florida.

36.    Defendant, Envision Capital, LLC ("ENVISION") is a Florida limited liability company with its registered address at home of Noveshen, located at 508 Coconut Isle Drive, Ft. Lauderdale, FL 33301. Defendant Noveshen is the Registered Agent. On information and belief, ENVISION was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Noveshen's liabilities, and for the purposes of receiving payments and shares of stock on his behalf. Lacking a business purpose or independent will of any sort, ENVISION served as an alter ego to Noveshen, completely beholden to his will.

37.     Defendant Yisroel A. Bornstein ("BORNSTEIN") is a natural person, a citizen of the State of New Jersey, residing at 36 High Street, Lakewood, NJ 08701. On information and belief, at all times relevant to this complaint, Bornstein was associated with Watson and assisted Watson in the scheme. Bornstein served as a liaison between Watson and Tripod, Goldstein, Eisenberg, Asher, and Kramer.

38.     Defendant, SCB & Associates, LLC ("SCB") is a New Jersey limited liability company with its registered address at Defendant Bornstein's principal address. Defendant Bornstein is the Registered Agent. On information and belief, SCB was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Bornstein's liabilities, and for the purposes of receiving payments and shares of stock on his behalf. Lacking a business purpose or independent will of any sort, SCB served as an alter ego to Bornstein, completely beholden to his will.

39.     Defendant Aryeh Goldstein ("GOLDSTEIN") is a natural person, a citizen of the State of New York, residing at 38 Olympia Lane, Monsey, NY 10952. On information and belief, at all times relevant to this complaint, Goldstein is the *de facto* manager of Tripod directly associated with Defendants EISENBERG and TRIPOD.

40.     Defendant, The Tripod Group, LLC ("TRIPOD") is a Wisconsin limited liability company with its registered address at 250 E. Wisconsin Avenue, Milwaukee, WI 53202. Defendant Eisenberg is the Registered Agent. On information and belief, Tripod was employed, at all times relevant to this complaint,

exclusively for the purposes of paying monies to settle Goldstein's and Isenberg's liabilities, and for the purposes of receiving payments and shares of stock on their behalf. Lacking a business purpose or independent will of any sort, Tripod served as an alter ego to Goldstein and Eisenberg, completely beholden to their will.

41.    Defendant Samuel H. Eisenberg ("EISENBERG") is a natural person, a citizen of the State of Florida, residing at 3411 Indian Creek Drive, Apartment 403, Miami Beach, FL 33140. On information and belief, at all times relevant to this complaint, EISENBERG was directly associated with Defendants GOLDSTEIN and TRIPOD.

42.    Defendant Theresa Lee Frey ("FREY"), also known as Theresa Graef, is a natural person, a citizen of the State of Michigan, residing at 1123 Wiltshire Drive, Lapeer, MI 48446. On information and belief, at all times relevant to this complaint, FREY was directly associated with Defendants WATSON and VIRMMAC.

43.    Defendant, Virmmac, LLC ("VIRMMAC") is a Michigan limited liability company with its registered address at home of Defendant FREY, 1123 Wiltshire Drive, Lapeer, MI 48446. On information and belief, VIRMMAC was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Frey's liabilities, and for the purposes of receiving payments and shares of stock on her behalf. Lacking a business purpose or independent will of any sort, VIRMMAC served as an alter ego to Frey, completely beholden to her will.

44.    Defendant Jeffrey E. Staller ("STALLER") is a natural person, a citizen of the State of Florida, residing at 3040 Canterbury Drive, Boca Raton, FL 33434. On information and belief, at all times relevant to this complaint, STALLER was directly associated with Defendants WATSON and HERITAGE.

45.    Defendant, Heritage Corporate Services, Inc. ("HERITAGE") is a Florida corporation with its registered address at home of Defendant STALLER, located at 3040 Canterbury Drive, Boca Raton, FL 33434. On information and belief, HERITAGE was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Staller's liabilities, and for the purposes of receiving payments and shares of stock on his behalf. Lacking a business purpose or independent will of any sort, HERITAGE served as an alter ego to Staller, completely beholden to his will.

46.    Defendant Curt Kramer ("KRAMER"), also known as Kurt Cramer, is a natural person, a citizen of the State of New York, residing at 6 Evergreen Way, Glen Head, NY 11545. On information and belief, at all times relevant to this complaint, KRAMER was directly associated with Defendants WATSON, and ASHER.

47.    Defendant, Asher Enterprises, Inc. ("ASHER") is a Delaware corporation with its registered agent W/K Incorporating Services, Inc. located at 3500 South DuPont Highway, Dover, DE 19901. On information and belief, ASHER was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle KRAMER'S liabilities, and for the purposes of receiving

-11-

payments and shares of stock on their behalf. Lacking a business purpose or independent will of any sort, ASHER served as an alter ego to Defendant Kramer, completely beholden to his will.

48.      Defendant David E. Price, ("PRICE") is a citizen of the State of Maryland residing at 13520 Oriental Street, Rockville, MD 20853. PRICE is an attorney licensed in Maryland and District of Columbia and owns the Law Offices of David E. Price located at the same address as his residence. Price represented SIMULATED, as well as, among others, Defendants WATSON, NOVESHEN, ASHER, and KRAMER.

49.      Defendant Tomer Tal, ("TAL") is a citizen of the State of California. Tal is an attorney licensed in California and owns the New Venture Attorneys, a California Professional Corporation located at 900 East Hamilton Avenue, Ste. 100, Campbell, CA 95008. Among others, Tal represented Defendants TRIPOD, STOCK-STREET, and SKYLINE in its acquisitions of securities from SIMULATED as well as other companies quoted on the Pink Sheets.

50.      Defendant Stock Street Capital LLC ("STOCK STREET"), is a Florida limited liability company with a principal place of business at 20423 State Route 7, #341, Boca Raton, Florida 33498 and its registered agent is Defendant KOIFMAN, with registered address at his home.

51.      Defendant Steven Koifman ("KOIFMAN") is a natural person residing at 18939 Concerto Drive, Boca Raton, FL 33498. Koifman was a registered stockbroker from 2002 until 2008. At all times relevant to the Complaint, Koifman

was president of STOCK-STREET. On information and belief, STOCK-STREET was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Koifman's liabilities, and for the purposes of receiving payment on his behalf. Lacking a business purpose or independent will of any sort, STOCK-STREET served as an alter ego to Koifman, completely beholden to his will.

52.     Defendant Skyline Capital Investments, Inc. ("SKYLINE"), is a Florida corporation with a principal place of business at 688 NW 156th Avenue, Pembroke Pines, FL 33028 and SKYLINE registered agent is Defendant WILDING, with the same registered address, at his home.

53.     Defendant Scott H. Wilding ("WILDING") is a natural person residing at 688 NW 156th Avenue, Pembroke Pines, FL 33028. At all times relevant to this complaint, Wilding was the president of SKYLINE. On information and belief, SKYLINE was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Wilding's liabilities, and for the purposes of receiving payment on his behalf. Lacking a business purpose or independent will of any sort, SKYLINE served as an alter ego to Wilding, completely beholden to his will.

54.     Defendant Monica Chui-Tiru ("CHUI") is a natural person residing at 100 Van Courtland Park S., Apartment B14, New York, NY 10463. At all times relevant to this complaint, was employed by WATSON. Her duties included bookkeeping, stock trading, and administration of various trading accounts for WATSON.

## JURISDICTION AND VENUE

55.    Jurisdiction is proper in this court as to Plaintiff pursuant to 28 U.S.C. §1332 because the conflict underlying this suit is between citizens of different States and Plaintiff has pled damages in excess of $75,000 exclusive of interest and costs.

56.    Jurisdiction is also proper pursuant to 28 U.S.C. §1331, because Plaintiffs have alleged that Defendants engaged in a fraudulent scheme in breach of, among others, Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; as well as, based upon the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1)(D).

57.    This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §1965 and the Florida Long-Arm Statute, Fla. Stat. §48.193.

58.    Jurisdiction is also proper pursuant to 28 USC §1367, this Court has supplemental jurisdiction over Plaintiff's additional claims arising under Florida law, including, among others, fraud, negligent misrepresentation, general negligence, unjust enrichment, and violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

59.    The Court has jurisdiction over this action pursuant to Section 21D of the Securities Act [15 U.S.C. §77v], in connection with the acts, practices, and courses of business alleged herein, Defendants, directly or indirectly, made use of the means and instruments of transportation and communication in interstate commerce and the mails.

-14-

60.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965, as well as, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

61.     This Court has personal jurisdiction over all Defendants in that each Defendant participated directly or aided and abetted the illegal activities described herein, carried on a business or business venture in Florida, committed a tortious acts within Florida and/or caused injury to persons within Florida arising out of acts or omissions by Defendants outside Florida. Moreover, many of the Defendants engage in substantial and not isolated activity within Florida.

62.     Defendants, directly and indirectly, have made and continue to make use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices and courses of business alleged herein in the Southern District of Florida and elsewhere.

## RELATIVE BACKGROUND FACTS
### The anatomy of a "pump-and-dump" scheme.

63.     The "pump-and-dump" scheme requires stock-market expertise and several participants acting in concert to effectuate the fraud.

64.     Firstly, one has to find an underperforming or struggling, publicly trading company (in current economic conditions – it is not difficult).

65.     Secondly, the fraudster must convince the management that he can get them the funds and management expertise they need to grow and support their business.

66.     Thirdly, begin to acquire the stock positions and obtain from the target-company deeply discounted stock.

67.     Fourthly, position the Public Relations surrogates on multiple public and internet-based bulletin boards dedicated to investing in penny-stocks[2].

68.     Start pumping-up the news about the company's products or services.

69.     The "news" stories and Public Relations surrogates, together with clever stock manipulation[3] that creates appearance of trade-volume, attract new and unsophisticated investors who feel they are buying "hot" stock.

70.     At the opportune moment, begin "dumping" the stock into the market and collect a windfall profits from ill-gotten stock.

71.     Keep bating the company's management with promises and occasional funds to get more deeply discounted stock.

72.     Once done, move-on to the next company.

**GENERAL FACTS**

73.     In early Spring of 2009, Defendant Aryeh Goldstein contacted Allen Licht with an introduction to Watson, who was presented as a "successful" business

---

[2] There are 829,000 Google results for the search-term "penny stocks bulletin board." There are literally thousands of different boards that attract millions of penny-stock investors.

[3] Typically, these "pump-and-dump professionals" have multiple trading accounts and relationships with broker-dealers. They can shift large blocks of stocks between accounts that creates appearance of large trading volume. Some investors are looking for large trading volume as criteria for investing. The defendants Goldstein, Eisenberg, Kramer, Asher and Tripod have their own, high volume stock trading departments. For Tripod, their department is staffed by a "Mendle" and "Goldie." Defendant Chow-Tiru was the trader for Watson. She travels with a laptop and is capable of moving or acquiring positions at any location with WiFi internet connection.

manager who has a pattern of assisting emerging companies with appropriate funding and business expertise to leverage company's technology and existing network of distributors for funding and growth.

74.    At that time, Simulated was stressed by the financial crisis effecting many businesses worldwide and lack of funding to fund its operation and customer purchases.

75.    In May of 2009, after several phone calls between Licht and Watson, Ajene Watson was joined by Defendant Eric Noveshen for an initial meeting between the Watson group and the Simulated's management that took place at the Simulated's office located at 20229 NE 15th Court, Miami, FL 33021.

76.    At the meeting, the management has disclosed the realistic picture of Simulated's financial conditions; and, the initial discovery of company's potential and ongoing difficulties was subject of deliberate scrutiny and analysis.

77.    After the initial meeting, in the e-mail of June 3, 2009, Watson writes:

"... *We'd like to determine fairly quickly what if anything we're able to do; engage and move forwarded immediately if we find that we can indeed bring real value to Simulated Environment Concepts.*" (See Exhibit "A")

78.    Subsequently, Watson craftily convinced Simulated's management and Allen Licht that Watson's group will be consulting Simulated towards success, for mutual benefit. Watson's group will assist in shaping the company to build-on its achievements, to expand in marketing, manufacturing, and distribution of Simulated's product.

79.    Mr. Watson was very convincing. In his e-mail of June 17, 2009 he

wrote:

> "... I wish to report that we're on what I believe is the last leg of
> crafting what we hope is the most reasonable operation-capital deal going into
> [Simulated]. It is important that we know we can make an adequate amount
> of money available to the [Simulated] effort in order to accomplish what the
> company will require."

In the same e-mail Mr. Watson continued,

> "... It seems as though all parties are intently interested in the
> [Simulated] opportunity and as you may or may not have noticed, are
> beginning to **position themselves accordingly**. As a team, we believe
> strongly that we can assist you in capturing what you originally came to the
> public markets to get... and then some. [emphasis added]"

The words "**position themselves accordingly**" are the stock-market

industry code-words indicating that the Watson's associates (the insiders) are

beginning to purchase Simulated's stock on the open market at discounted price in

an anticipation of sale when the investor relations campaign will cause the stock

price to go up. (See Exhibit "B")

80.    To add to his convincing pitch, in the e-mail to Allen Licht, on July 24,

2009, Mr. Watson writes,

> "... First, let me tell you that we have received much greater response
> from our summary than expected. Our entire team appears to be very excited
> about the prospect of working with you and cannot wait to officially get
> started ... We are certainly looking forward to working with you and
> [Simulated] and expect to be successful both in the short and long term."

(See Exhibit "C")

81.    Throughout this scheme, Watson emphasized "trust" and "honesty."

However, after months and years of working with Watson, the Plaintiff and

Simulated's management began distrusting and suspected dishonesty.  August 2,

2009 e-mail speaks for itself,

> *". . . [O]ur attempt is to further provide you with the comfort of knowing*
> *that **our objectives are long term**.  If you do not see value within the next*
> *year' we do not see value.  It's just that simple . . . Again, I hope this gesture*
> *sets the tone for a **trusting** and mutually respectful relationship.  Our*
> *business model relies heavily on it. [emphasis added]"*

(See Exhibit "D")

82.    On August 3, 2009 Simulated, by its Managing Director Allen Licht,

executed the contract with Watson (see Exhibit "U").

83.    The contract specified that Simulated would pay Watson $255,000 (two

hundred and fifty five thousand) retainer and a <u>monthly fee</u> of $67,000 (sixty seven

thousand).

84.    It is plainly understood that Simulated was never in the position to

pay such retainer, nor did the company ever pay Watson in cash. With a nod-and-

wink, Watson suggested to the management that he would be very happy to receive

his payment in company's stock or warrants, received at a significant discount to

the market price. Therefore, shortly after stock transfers from Simulated to his

account, Watson distributed the shares to Tripod, Asher, Goldstein, Eisenberg,

Kramer, Wilding, and Koifman, among others, to sell them on the open market and

convert them into money.

85.    Between September of 2009 and August of 2011, Defendants, through

Watson, received and sold on the open market over 350,000,000 (three hundred and

fifty million) shares of Simulated's unregistered stock. The Defendants, through

regular dumping and short-sales machinations, have sold these shares for over $3,000,000 (three million dollars).

86.   On August 11, 2009, Allen Licht is introduced to Defendant James Gibbs. Watson writes, "Please be aware that Mr. James Gibbs, from our office, will likely contact you today regarding the Transfer Agent issue." This e-mail sets into motion the transfer from Simulated's existing Transfer Agent to a new Transfer Agent (American Stock Transfer and Registrar) that can be controlled and influenced by the Defendants. (See Exhibit "E")

87.   Several weeks later, the "pump" phase of the "pump-and-dump" scheme was initiated; Watson needed to make a public announcement concerning his group's involvement with Simulated. In his e-mail of October 7, 2009 Watson writes:

> *"This is one of the reasons I propose we release this news after its revealed we're expanding another client's credit facility from $500k to $2mm[4]. I believe this will assist us in allowing [Simulated] to gain traction with traders. Not to mention that Dan wants us to put a similar facility in place with [Simulated]. I believe the correlation would become obvious."*

(See Exhibit "F")

88.   Additionally, to maintain the small-investor excitement, in September-October of 2009, Watson demands that the company engage QualityStocks group, and later, in January of 2010 – Kennective, LLC; in April of 2010 –

---

[4] This comment is associated with another company – E-Doorways [EDWY], also traded on PinkSheets. Unfortunately, at the hands of Defendants, EDWY has suffered the same fate as Simulated. Its stock was decimated by "pump-and-dump" scheme and they have never seen the credit facility of neither $500,000 nor the $2,000,000. These announcements amounted to nothing more than hype.

InvestorsVoice.com, LLC; in June of 2010 – Keros Capital; in August of 2010 –

Stock Street Capital, LLC and Defendant Steven Koifman; in September of 2010 –

HotShotStock Corporation and Virmmac, LLC; in November of 2010 – Heritage

Corporate Services, Inc. and Defendant Staller.

89.   Later-on, in May of 2011, Watson demanded that Simulated renew the

contracts with HotShotStock Corporation, Virmmac, LLC, and Keros Capital; and

establish new and additional contracts with Shareholder Development Group, LLC

and Grass Roots Research and Distribution, Inc.

90.   These Public/Investor Relations groups mentioned in §§ 88 through 89

above, used various techniques of internet promotions and e-mail blasts to "pump-

up" the Simulated's value and its stock price.

91.   As these companies provided the "pump-up" initiatives, Watson

continued to entice Licht and Simulated's management with promises. One

example: on December 7, 2009 Watson writes,

> ". . . Our team convened late last night for an hour or so to discuss the best
> ways to move forward with your company under the current set of
> circumstances.  We have restrategized our original plan and continue to feel
> just as confident in our ability to provide you with the level of service you
> require.  However, in order to provide our services most effectively, we will
> need to take more extreme actions to ensure that [Simulated] indeed becomes
> attractive to investors, self efficient, profitable, an investment worthy stock
> and a safe place for our lenders to sit capital."[5]

(See Exhibit "G")

---

[5] Please note the absence of any details. The message sounds upbeat and
convincing, however, lacking any substance or specificity.

92.    On December 14, 2009, Mr. Watson request that Simulated appoint an attorney, Defendant Price as a corporate secretary. In his e-mail to Licht, Watson writes, "...we will need to appoint a short term Corporate Secretary.  I'd like to use one of our attorneys Mr. David Price to fill this role." Subsequently, Price became an attorney who issued many opinion letters to clear restricted stock and establish the foundation for fraudulent transactions. (See Exhibit "H")

93.    The e-mail of December 15, 2009, clearly places Watson at the head of the scheme (See Exhibit "I"). He continues to weave the web of deception and continues to set-up Simulated for the ultimate "pump-and-dump". Here Watson:

    a.  Directs Gibbs to initiate Transfer Agent switch to his preferred vendor, American Registrar and Stock Transfer;

    b.  Directs Noveshen to assist with accounting. At which point, Noveshen installed his mother Sherrill Wilson, as the bookkeeper;

    c.  Confirms installation of attorney Price;

    d.  Directs Vincent Hess to develop Investor Relations website;

    e.  Continues to formulate the message to potential buyers of the pumped-up stock, i.e. "...Trey and I are strategizing on how best to speak to the current shareholder base."

    f.  Together with Noveshen, Watson arranges for the firm of Gersten, Savage to represent the company, in addition to Price[6].

94.    On December 29, 2009, Watson prepares and discriminates, to the national wire services, an "up-beat" press release designed to lure investors and boast his enterprise. (See Exhibit "J")

---

[6] At this time, Plaintiff is not aware if Gersten, Savage produced any opinion letters for Simulated's stock issuance.

95.   Much of the time between January through end of August of 2010 was spent in preparations and updates for OTC Markets disclosures and accounting.

96.   However, in order to facilitate the scheme, Watson had to come-up with a process wherein a large block of Simulated's free trading stock was available at his disposal.

97.   Typically, according to the SEC rules governing stock issuance for the micro-cap companies, any new stock issued by Simulated in exchange for cash or services, would have to be "restricted" and held by the purchaser for at least one year before an investor could begin selling the stock on the open market.

98.   To circumvent the process, Watson, Bornstein, and Noveshen arranged to purchase a portion of an old and aged Simulated's promissory note (Exhibit "K") "held by Tripod. Once purchased, Defendants invented a scheme that would permit them to immediately convert that portion of the note to free-trading shares at the price of $0.0001 (one thousands of a penny) per share, while the actual per-share price during that time was averaging $0.04. Effectively, Defendants acquired 100,000,000 (one hundred million) free trading shares with the street-value at approximately $4,000,000 (four million dollars) for the total cost of $10,000 (ten thousand dollars)[7].

99.   To facilitate this transaction, Defendants would require the help of Licht and Simulated. In assisting Defendants, Licht relied on the representations made by Watson, Bornstein, Noveshen, Price, and others. Licht further relied on

_____

[7] 100,000,000 * 0.0001 = $10,000

these representations when he helped during preparations of legal documents authorizing the transaction.

100.   On June 3, 2010, attorney Price, acting on behalf of Watson, has issued an opinion letter paving the way for the above referenced transaction to consummate (See Exhibit "L").

101.   With assistance from Defendants Goldstein and Eisenberg, Watson completed the transaction and became an owner of 100,000,000 (one hundred million) free trading shares of Simulated's stock worth approximately $4,000,000 (four million dollars).

102.   Sadly, this was just the beginning. Over the term of relationship between Licht, Simulated and Defendants, the Defendants received over 350,000,000 (three hundred and fifty) million shares of Simulated stock.

103.   Effectively, these shares were not owned by Watson alone. The shares were always intended for distribution to all participants in the scheme. All Defendants accepted the discounted shares with full knowledge and lucid understanding of Licht's expectations. With years of experience in the PinkSheets or micro-cap industry, Defendants knew beyond any doubt that they were receiving extremely discounted shares in exchange for their promise to invest in and manage a public relations campaign on behalf of the Simulated and to provide Simulated with adequate financing to expand manufacturing, renew the design of its product, invest into marketing, and pay long overdue salary to its managers, including Licht. The transaction simply made no sense otherwise. No rational individual would give-

away company's stock, at such discount, without some significant benefit being offered in return.

104.   Contrary to the promises and representations made to Licht and others, Defendants made no effort to launch a sustained public relations campaign on behalf of the Company or create appropriate foundation for traditional investments. Instead, Defendants began selling their shares as quickly as possible, in utter disregard of the promises made. If at any time, Defendants initiated any public awareness campaigns, these were designed to pump-up the price, maintain street-level interest, and to assist the Defendants in dumping the shares.

105.   On July 14, 2010 and September 13, 2010, attorney Price, without ever visiting Simulated or consulting with the management, issued an opinion letter titled "Sufficiency of Adequate Current Information." Before issuing such letter, Price was obligated to make an in-person visit to the client. However, to this day, Price never made such visit[8] (See Exhibit "M").

106.   From this point forward, in addition to restricted stock and preferred shares, Watson began issuing and disbursing to the members of his group, free-trading shares received in the fraudulent transaction described in §§ 96 through 101 above (See Exhibit "N").

107.   With the excitement generated by repeated press releases, web posts, and e-mail blasts generated by Public and Investment relations groups, Watson

---

[8] Since July 12, 2010, Price issued numerous opinion letters without a visit to Simulated, as required by the OTC rules and Securities Act.

colludes with Tripod, Asher, Goldstein, Eisenberg, Kramer, and others to begin the process of selling newly acquired shares to unsuspecting street investors.

108.   The following is the partial list of free-trading stock issued to and sold by Defendants (See Exhibit "O"):

| | Date of Issue | Value of Stock | Number of Shares | Issued To: |
|---|---|---|---|---|
| | | | | **Partial List of Free Trading Stock Issuance to Defendants** |
| a. | 9/2/2010 | $114,000 | 6,000,000 | Tripod, Goldstein and Eisenberg |
| b. | 11/30/2010 | 72,000 | 6,000,000 | Asher Enterprises, Inc. and Kramer |
| c. | 12/8/2010 | 39,500 | 5,000,000 | Ajene Watson, LLC |
| d. | 12/8/2010 | 37,525 | 4,750,000 | Ajene Watson, personally |
| e. | 12/15/2010 | 110,000 | 10,000,000 | Asher Enterprises, Inc. and Kramer |
| f. | 12/20/2010 | 36,000 | 4,000,000 | Tripod, Goldstein and Eisenberg |
| g. | 1/4/2011 | 45,000 | 10,000,000 | Asher Enterprises, Inc. and Kramer |
| h. | 1/13/2011 | 130,000 | 20,000,000 | Asher Enterprises, Inc. and Kramer |
| i. | 1/26/2011 | 35,000 | 10,000,000 | Tripod, Goldstein and Eisenberg |
| j. | 2/3/2011 | 78,000 | 20,000,000 | Tripod, Goldstein and Eisenberg |
| k. | 2/8/2011 | 25,000 | 10,000,000 | Asher Enterprises, Inc. and Kramer |
| l. | 3/22/2011 | 69,000 | 32,000,000 | Tripod, Goldstein and Eisenberg |
| m. | 3/28/2011 | 18,200 | 13,000,000 | Tripod, Goldstein and Eisenberg |
| n. | 3/29/2011 | 38,000 | 20,000,000 | Skyline and Wilding |
| o. | 3/29/2011 | 38,000 | 20,000,000 | Stock Street and Koifman |
| p. | 4/29/2011 | 65,385 | 38,461,538 | Tripod, Goldstein and Eisenberg |
| q. | 5/13/2011 | 139,500 | 45,000,000 | Asher Enterprises, Inc. and Kramer |

| | | | | |
|---|---|---|---|---|
| r. | 6/17/2011 | 6,440 | 9,200,000 | Ajene Watson, LLC |
| s. | 6/23/2011 | 28,000 | 28,000,000 | Ajene Watson, personally |
| t. | 6/23/2011 | 30,000 | 30,000,000 | Shareholders Developers Group |
| u. | 7/18/2011 | 5,800 | 4,200,000 | Tripod, Goldstein and Eisenberg |
| v. | 8/11/2011 | 7,400 | 6,200,000 | Tripod, Goldstein and Eisenberg |

109.   In addition to shares of Simulated listed in §108 above, there were millions of other shares issued for various services to perpetuate the scheme. Among others, these were issued to insiders like Hess, Noveshen, Gibbs, Chui-Tiru, and Bornstein; as well as various Public and Investor relations groups who provided marketplace "excitement" and kept small investors bated. Defendants Heritage and Stoller; QualityStocks, LLC; Grass Roots research & Distibution, Inc.; Shareholders Development Group, LLC; Defendants Virmmac, LLC and Frey; and Kermos;

110.   Sometime in March of 2011, Watson introduced attorney Tal to the company. Just as Price, Tal provided opinion letters for the Transfer Agent required to clear stock certificates and facilitated other transactions.

111.   Specifically, Tal was involved in March 29, 2011 transaction with Defendants Wilding, Koifman, Stock Street, and Skyline (see § c108 above, lines n. and o.)[9]; Note Assignment between Watson and Tripod on April 1, 2011; and, share issuance to Tripod on April 28, 2011 (see § 108 line p. and Exhibit "P").

---

[9] Subsequently, as a result of sell-off outlined in the §§ 114 through 119 below, the transaction was flagged by FINRA and SEC.

112.   Beginning in April and continuing in May of 2011, Licht and other management members of Simulated began confronting Watson concerning ongoing situation; in numerous telephone conversations and e-mails, Licht expressed company's disappointment, loss of trust with Watson's group, as well as embarrassment and aggravation suffered by repeated phone calls from shareholders, as well as defamation suffered from public internet posts about Licht and Simulated.

113.   On May 23, 2011, Licht sent to Watson, via e-mail, an 11 page document outlining failures of his group as well as loss of trust in the process. At the conclusion of the document Licht writes,

> *"If we are to go on, we must be secure in the process; you must be honest with us and yourself. We must have guaranties of success. You must shape-up and begin to deliver on your promises. We are not interested in staking our future on such a tenuous and untrustworthy process."*

(see Exhibit "Q")

114.   In the subsequent phone-call conversation, Licht advised Watson that Simulated intends to stop the relationship with his group.

115.   In response, Watson has issued a scathing reproof (see e-mail from Watson dated Monday, May 23, 2011, marked as Exhibit "R") and scheduled an immediate meeting (a day later, Wednesday, May 25, 2011), to fly-in to Florida to speak to Licht and other managing members of Simulated.

116.   On Wednesday, May 25, 2011, Watson and Staller, without prior authorization from Licht or any other managers at Simulated, produced and published an unauthorized press release; and, in conjunction with Defendants

-28-

Wilding, Koifman, Stock Street, Skyline, Tripod, Goldstein, Eisenberg, Asher, Kramer, Chui-Tiru, Novoshen, Bornstein, SCB and Associates, Envision Capital, as well as with other Defendants comprising Public and Investor relations Groups, began a massive sell-off of Simulated's stock that led to complete erosion of trust and confidence of the common shareholders.

117.   By the end of the day on Wednesday, May 25, 2011, Simulated's stock has traded over 170,000,000 (one hundred and seventy million) shares, as compared to 2 to 6,000,000 shares on any average day.

118.   In response to Watson's flagrantly deceptive and illegal actions, by the end of the day on Wednesday, May 25, 2011, Licht wrote (see Exhibit "S"),

> *"Ajene, I just have to express once again my disappointment concerning the press release. It is true that we worked together on drafting it; however, we did not agree on having it released. Furthermore, the steps we implemented to prevent this from happening were deliberately circumvented, which makes this appear as calculated abuse of our relationship. Please alert all individuals who are responsible for this action not to ever send-out a press release without our explicit approval."*

However, by this time, the damage to Plaintiff and Simulated was significant and irreversible.

119.   During the day on Wednesday, May 25, 2011, Watson was joined, in-person, by Noveshen and Bornstein in attempts to smooth over the damage. On the same day, Watson, Bornstein, and Noveshen met with Defendants Koifman and Wilding and orchestrated massive dumping of the shares.

120.   Subsequently, in October of 2011, Licht and other Simulated managers have realized that the Defendants have misrepresented their intentions and had no

intent to help the company in obtaining funding or help in management in public relations campaigns.

121.   Once the entire scheme unraveled and the price of Simulated's shares plummeted, individual street investors began to fault and accuse Plaintiff of mismanagement and impropriety. There were numerous posts on the internet, in open forums. Furthermore, the investors, outraged by the scheme, began inundating Plaintiff with e-mails and phone calls (see Exhibit "T").

122.   At all times relevant to this Complaint, Defendants falsified information, mislead Plaintiff and Simulated's management members, as well as other general investors. Defendants produced fraudulent documents and/or made fraudulent representations that were intended to generate money for themselves and induced loss for the Plaintiff.

123.   These false, misleading, inaccurate and/or fraudulent statements and/or documents and/or representations were intended, and continue to be intended, to assist in obtaining good-will from the Plaintiff in order to obtain shares of Simulated's stock for sale by Defendants.

124.   These false, misleading, inaccurate and/or fraudulent statements and/or documents and/or representations did cause Plaintiff to approve issuance of shares of Simulated's stock to the Defendants.

125.   The conspiracy and scheme, as outlined above and, upon information and belief, is ongoing. Funds from the Defendant sales of Simulated's stock were

paid and distributed to the individual Defendants, and/or other individuals and/or entities.

126.    Defendants established and/or operated shadow companies (among others, Watson LLC, Tripod and Asher) and money from this conspiracy and scheme to defraud, were transferred directly to individual Defendants.

127.    In distributing Simulated's stock to the public market, individual Defendants and Defendants Corporations, acted as brokers by participating in securities transactions at key points in the chain of distribution.  In fact, most of the Simulated's stock that reached the public market was funneled through the Defendants.

128.    Defendants also acted as dealers in Simulated's stock by, among other things, participating in an underwriting with respect to that stock and demonstrating a willingness to sell Simulated's stock on a continuous basis. Defendants also received dealer-type compensation, profiting on the spread between the deeply discounted purchase price and the price at which the shares were ultimately sold in the open market. However, none of the Defendants were ever registered with the SEC as brokers or dealers.

129.    Upon information and belief, Watson received additional monetary payments as kickbacks for facilitating lucrative acquisition of deeply discounted Simulated's stock. Defendants sold Simulated's securities as part of a kickback/payment arrangement and not as a traditional investment practice. Defendants' actions were geared to helping the scheme and conspiracy.

130.   It was a further part of the conspiracy and scheme to defraud that false, fraudulent, misleading, and/or inaccurate, statements, and/or documents and/or representations were created, produced, and/or sent, directly or indirectly, by Defendants to Plaintiff and/or Simulated's Transfer Agent to induce and/or deceive Plaintiff and the Transfer Agent into making improper and/or incorrect insurance of Simulated's securities.

131.   Defendants mailed to Plaintiff and Simulated's Transfer Agent various stock issuance requests, statements, opinion letters, and/or documents and/or representations. Defendants did so with the knowledge that the stock issuance requests, statements, opinion letters, and/or documents and/or representations would be relied upon by Plaintiff and Transfer Agent in making stock issuances.

132.   Additionally, these stock issuance requests, statements, opinion letters, and/or documents and/or representations were false, fraudulent, misleading, and/or inaccurate as they inaccurately reflect and/or misrepresent the true intent of the transactions and are not supported by law.

133.   Defendants mailed stock issuance requests, statements, opinion letters, and/or documents and/or representations in their individual names and/or in the names of the Defendants' Corporation and further utilized Defendants Attorneys to create legitimacy for the requests.

134.   Plaintiff reasonably relied upon representations set forth on Defendants' statements and/or other documents for approving issuance of Simulated's stock.

135.   Upon information and belief, the stock issuance requests, statements, opinion letters, and/or documents and/or representations Defendants were intended to extract free-trading stock from Plaintiff and Simulated for further distribution and sale to unsuspecting investors in Florida and other States in violation of Florida Securities and Investor Protection Act ("FSIPA") Fla. Stat. § 517 and other applicable Florida Law.

136.   In reasonable reliance on and in belief of the accuracy of the stock issuance requests, statements, opinion letters, and/or documents and/or representations issued by or on behalf of Defendants and/or the Defendant Corporations, Plaintiff authorized stock issuance to the Defendants. Furthermore, Plaintiff incurred damages by making stock issuance to the Defendants.

137.   In furtherance of and for the purpose of executing the conspiracy and scheme to defraud, Defendants, on numerous occasions, used and caused to be used mail depositories of the United States Postal Service and wires by both placing and causing to be placed letters, stock issuance requests, statements, opinion letters, and/or documents, and/or other mailable  matter in said depositories and by removing and causing to be removed letters and other mailable matter from said depositories and/or by the use of facsimile machines, and/or by the use of e-mail.

138.   Documents attached as exhibits to this Complaint are a small representation of total documentary evidence. Other false, fraudulent, misleading, and/or inaccurate documents, and/or records that were sent by Defendants will be revealed and disclosed during discovery in this matter.

139.   Each use of the mails and wires in connection with the scheme and artifice to defraud constitutes the offense of mail and wire fraud as proscribed and prohibited by18 U.S.C. §1343.51. In connection with the activities of all Defendants giving rise to this action, all Defendants conspired to engage in the various activities and aided and abetted one another in the said activities as described herein.

140.   In connection with the activities of all Defendants giving rise to this action, the Defendants acted with malice, intent and knowledge. The Defendants knew that the stock issuance requests, statements, opinion letters, and/or other documents were false and that the false submissions would be relied upon by Plaintiff when making stock issuances.

141.   At all times relevant hereto, Defendants knew, or should have known, that Plaintiff was relying on the truth and accuracy of Defendant' stock issuance requests, statements, opinion letters, and/or other documents.

142.   The scheme to systematically defraud Plaintiff by submitting, through the mail, stock issuance requests, statements, opinion letters, and/or other documents which were false and inaccurate, was facilitated, aided and assisted with the cooperation, assistance and allegiance of attorneys Price and Tal.

143.   Each predicate act (e.g. the submission of each false stock issuance request, statement, opinion letter, and/or document via US Mail) was committed with the same purposes (to induce stock issuance from Plaintiff and for Defendants' personal gain), the same result (the actual collection of payments from Plaintiffs for

the benefit of Defendants), the same participants (the individual Defendants, as well as the Defendant Corporations), the same victims (Plaintiff and other Simulated's Management Members), and the same method of commission (submitting stock issuance requests, statements, opinion letters, and/or documents, and ultimate sale of securities on the open market).

144.   Plaintiff allege that each predicate act was related to the others insofar as each one was the result of a common plan, consistently applied using standard practices, and producing a consistent result.

145.   It was a further part of the conspiracy and scheme that the Defendants fraudulently concealed their involvement in the conspiracy and scheme and concealed the conspiracy and scheme as described herein.

146.   During the relevant times, in connection with the activities of the Defendants giving rise to this action, Defendants intentionally acted to fraudulently conceal the nature of their activities in order to insulate themselves from liability for the fraudulent and illegal activities they were undertaking, in a manner that a reasonable person would believe their assertions and comply with Defendants' stock issuance requests.

147.   Due to the concerted efforts of all Defendants to conceal their fraudulent activities, Plaintiff did not discover their injury and the source of their injury, despite the exercise of reasonable diligence, until after January of 2012. Plaintiff's exercise of reasonable diligence included, but is not limited to, review and

evaluation of requests, which included but was not limited to, the review the supporting records submitted by the Defendants.

148.   Plaintiff was injured in his business and property in an undetermined amount by Defendants' misrepresentations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants as set forth above. Such injury includes: the deprivation of the ability to conduct the Plaintiff's commercial activities on the basis of true, accurate, complete, and standard business practices; the loss of monies as a result of false, fraudulent, and/or misrepresented stock issuance requests, statements, opinion letters, and/or documents; the expenses incurred in payments made to others (i.e. transfer agent, accountants, postage, web development, etc.); and defamation.

149.   The relief sought by Plaintiffs against Defendants includes compensatory damages, restitution for payments made by Plaintiff to others in reliance on Defendants' false representations, loss of income, and treble damages pursuant to 18 U.S.C. §1964(c), costs of investigation and suit, interest and attorneys' fees (if Plaintiff retains an attorney in the future).

## COUNT I
### Fraud

150.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

151.   The representations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants, as set forth above, constitute false and fraudulent representations.

152.   Defendants intended that Plaintiff would be induced by such false and fraudulent representations to provide Simulated's shares of stock to Defendants and/or to other individuals.

153.   Plaintiffs and/or others justifiably relied on these representations made by the Defendants as described in this Complaint, in authorizing stock issuance to Defendants and/or others in the belief that issuance was appropriate under applicable law and was not intended to decimate or injure Simulated or Plaintiff.

154.   As a result of the false and fraudulent representations by Defendants, Plaintiff suffered injury as set as described throughout this Complaint.

155.   The false and fraudulent representations by Defendants were made with malice, vindictiveness and wanton disregard for the rights of Plaintiff.

## COUNT II
### Fraud in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, 15 U.S.C. 78j and 17 C.F.R. 240.10b-5.

156.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

157.   All Defendants, directly and indirectly, with scienter, including with recklessness disregard, in connection with the purchase and sale of securities (*SEC v. Zanford*, 535 U.S. 813 (2002)) by use of the means or instrumentalities of interstate commerce, or of the mails, have employed devices, schemes or artifices to defraud; have made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or have engaged in acts, practices or courses of business which have been and are operating as a fraud upon the purchasers or sellers of such securities.

158.   The statements made by Defendants, or omissions of material facts, are that they intended to invest in and manage business image on behalf of the Company, for the purposes of generating interest in the Company amongst bankers and investors, as well as the investing public . Furthermore, Defendants misrepresented their intentions regarding disposition of Simulated's shares after acquisition, to the extent that they omitted to disclose their intention to sell their Shares aggressively into the market and their intention to dump all of the shares in a matter of days. All of these statements proved false or materially misleading given the context in which they were made.

159.   Plaintiffs relied on these material misrepresentations and material omissions when entering into the transaction that resulted in, among other things, the issuance of shares to Defendants. Had Plaintiff known that the above statements were false or materially misleading, he would have rejected Defendants' stock issuance requests.

160.   Furthermore, had Plaintiff known that Defendants would sell all of the Shares within a few days and thereby destroy the value of the Plaintiffs' shares and value of Simulated, he would never have entered into the transaction.

## COUNT III
### Violations of Securities Act
### Sections 5(a) and 5(c)

161.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

162.   During the relevant period, all Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no valid registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

163.   Defendants Price and Tal had knowingly and deliberately issued false legal opinions in which they falsely asserted that Defendants had acquired shares from Simulated for investment purposes, rather than for resale; thereby enabling Defendants to obtain Simulated's shares without a restrictive legend or registration making shares available for immediate resale to the public.

164.   Defendants engaged in or participated in the unlawful distribution of securities as described above.

165.   By reason of the foregoing, Defendants, directly or indirectly, violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT IV
### Violation of RICO

166.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

167.    Plaintiffs are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and1964(c).

168.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3).

169.    At all times material to this Complaint, Defendants and/or other individuals were associated in fact and thus are an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) (hereinafter "the enterprise").

170.    At all times material to this Complaint, Defendants and/or other individuals engaged in "racketeering activity" by actively participating, among others, in the activity of "fraud in the sale of securities" within the meaning of 18 U.S.C. § 1961(1)(D).

171.    At all times material to this Complaint, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways and telephone lines.

172.    At all times material to this Complaint, each Defendants were associated in-fact although distinct from the enterprise.

173.    At all times material to this Complaint, each Defendant conducted or participated in the conduct of the enterprise's affairs and/or each Defendant had a role in directing or managing the operations or affairs of the enterprises.

174.    The Defendants who are associated in-fact were not acting in furtherance of the corporate Defendants' legitimate pursuits when committing acts of mail fraud and other wrongful acts as described in this Complaint.

175.    From at least 2009, Defendants devised and participated in a scheme to defraud Plaintiff and others as set forth above.

176.    Each Defendant conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, but not limited to, the multiple instances of mail and wire fraud as set forth above.

177.    These acts of fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

178.    The conduct of each of the Defendants constitutes a violation of 18 U.S.C. § 1962(c).

179.    Plaintiff and others were directly injured in their business and property by Defendants' violations of 18 U.S.C. §1962(c).

<u>COUNT V</u>
**Conspiracy to Violate RICO**

180.    Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

181.    Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

182.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962( c).

183.   At all times material to this Complaint, Defendants and/or other individuals were associated in fact and thus are an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

184.   At all times material to this Complaint, Defendants and/or other individuals engaged in "racketeering activity" by actively participating, among others, in the activity of "fraud in the sale of securities" within the meaning of 18 U.S.C. § 1961(1)(D).

185.   At all times material to this Complaint, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways and telephone lines.

186.   At all times material to this Complaint, each Defendant was associated in-fact although distinct from the enterprise.

187.   From at least 2009, Defendants devised and participated in a scheme to defraud Plaintiff and others as set forth above.

188.   Each Defendant conspired and agreed among themselves and with other co-conspirators to violate 18 U.S.C. § 1962(c), that is to conduct or participate directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the numerous acts of mail and wire fraud as set forth above.

189.   These acts of mail and wire fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

190.    Said conduct constitutes a violation of 18 U.S.C. § 1962(d).

191.    Plaintiff and others were directly injured by the Defendants in their business and property as set forth above and described throughout the Complaint.

## COUNT VI
### Negligent Misrepresentation

192.    Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

193.    Defendants made and represented material fact to Plaintiff and others that they were accredited investors and business management experts.

194.    However, none of the Defendants were accredited investors or had education, experience, or expertise to assist businesses with funding or management.

195.    Defendants made the misrepresentations without knowledge as to its truth or falsity, or under circumstances, should have known of its falsity.

196.    Defendants intended that the misrepresentation induce Plaintiff and other to act and approve share issuance to the Defendants.

197.    In justifiable reliance on the negligently false information provided by Defendants, Plaintiff and others were directly injured by the Defendants in their business and property as set forth above and described throughout the Complaint.

## COUNT VII
### Concerted Tortious Action

198.    Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

199.   As described in paragraphs 73 through 149 of this Complaint, Defendants and/or others did various tortious acts in concert with each other.

200.   These tortious acts were committed pursuant to a conspiracy and scheme to defraud Plaintiff and others as set forth above.

201.   Defendant WATSON gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

202.   Defendant GIBBS gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

203.   Defendant NOVESHEN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

204.   Defendant BORNSTEIN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

205.   Defendant GOLDSTEIN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

206.   Defendant ISENBERG gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

207.   Defendant FREY gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

208.   Defendant STALLER gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

209.   Defendant KRAMER gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

210.   Defendant PRICE gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

211.   Defendant TAL gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

212.   Defendant KOIFMAN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

213.   Defendant WILDING gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

214.   Defendant CHUI gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

215.   Defendant WATSON LLC gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

216.   Defendant ENVISION gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

217.   Defendant SCB gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

218.   Defendant TRIPOD gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

219.   Defendant VIRMMAC gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

220.   Defendant HERITAGE gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

221.   Defendant ASHER gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

222.   Defendant STOCK STREET gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

223.   Defendant SKYLINE gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

224.   The above described acts of Defendants, violate 18 U.S.C. §§ 1961(1)(D), 1962(c), 1964(c) and 1964(d) and also constitute fraud and caused Plaintiff and others harm as set forth above.

225.   The Defendants conduct was malicious and outrageous, as set forth above.

<u>COUNT VIII</u>
**Conspiracy**

226.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

227.   Defendants and/or others conspired together to engage in fraudulent actions that violated Florida Law as described in this Complaint.

228.   Defendants and/or others conspired together to commit fraud and tortious acts against Plaintiff and others as described in this Complaint.

229.   Defendants engaged in numerous overt acts in furtherance of this common purpose, including but not limited to, actions detailed in paragraphs 73 to 149.

230.   The Defendants conduct was malicious and outrageous as set forth in paragraphs 73 to 149.

231.   Plaintiff and others were damaged by the actions of the Defendants as set forth in paragraphs 73 to 149.

**COUNT IX**
**Unjust Enrichment**

232.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

233.   Defendants' retention of amounts received through the "pump-and-dump" scheme was wrongful because these monies were obtained as a direct result of fraud and other wrongful acts set forth in this Complaint.

234.   Plaintiff and others have been harmed by Defendants' acts in wrongfully obtaining and retaining these monies because Plaintiff would not have approved stock issuance if he had known at the time that Defendants acts were wrongful, fraudulent and/or illegal.

235.   Defendants' retention of these payments violates fundamental principles of justice, equity and good conscience.

236.   Additionally, Defendants' retention of money received from Plaintiffs due to Defendant' fraudulent and wrongful practices as described in this Complaint is wrong and unjust.

237.   Plaintiff and others have been harmed by Defendants' misrepresentations.

238.   Defendants have been unjustly enriched and to allow Defendants to retain these amounts would violate fundamental principles of justice, fairness, equity and good conscience.

**COUNT X**
**FLORIDA'S DECEPTIVE AND UNFAIR TRADE**
**PRACTICES ACT VIOLATIONS**

239.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

240.   Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 501.20 *et. seq.,* makes it unlawful for ". . . unconscionable acts of practices and unfair or deceptive acts or practices in a conduct of any trade or commerce." Specifically, Defendants have engaged in activities in the State of Florida and within this District which violate the statute by acting in concert and conspiracy with others to coerce Plaintiff and others, to unwilling participation in a "pump-and-dump" scheme. Specifically, Defendants: (a) failed to properly advise and inform Plaintiff and others, of their intent to engage in a "pump-and-dump" scheme, (b) failed to advise, inform or otherwise notify Plaintiff and others of their intent to artificially inflate the price of Simulated's stock and use Plaintiff's cooperation in doing so, (c) used Plaintiff's name in a website and public press releases to falsely induce the public to believe that Plaintiff is the one responsible for the "pump-and-dump" scheme, and (d) repeatedly deceived Plaintiff and others with unsubstantiated promises and assurances. Defendants' and their representatives'

actions are taken knowingly, intelligently and with a purpose to deceive or misinform street investors, as well as, Plaintiff and others.

241.   As a direct and proximate result of the activities and conduct in violation of Florida's Deceptive and Unfair Trade Practices Act, Plaintiff is an "aggrieved person" as defined by said statute and has suffered damages within the meaning of said statute.

242.   Plaintiff seeks to recover the actual and treble damages against Defendants as well as reasonable attorney's fees (if an attorney is retained in the future) and court costs under Florida Statutes §501.211 and §501.2105.

## COUNT XI
### Defamation

243.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

244.   The Defendants have defamed Plaintiff through the actions described above.

245.   Defendants intentionally kept Plaintiff on the frontlines of communications with general public. Defendants knew that their actions would tend to harm (and have harmed) Allen Licht's reputation so as to lower Licht in the estimation of the community and/or to deter third persons from associating or dealing with Licht.

246.   Defendants' actions have caused others to publish statements on the internet defaming Licht.

247.   The Defendants' actions have also slandered Licht.

248.    The Defendants' actions (both libelous and slanderous) clearly applied to Licht.

249.    The third party recipients or readers of the defamatory statements would (and have) understood that facts exist which indicate that Licht has engaged in fraudulent and/or otherwise improper and/or illegal conduct.

250.    The Defendants' defamatory actions impute to Licht conduct, characteristics, and/or a condition that would adversely affect Licht in his lawful business or trade.

251.    The Defendants' defamatory statements and actions were defamatory per se.

252.    The Defendants' actions as described above have also been designed to communicate and have communicated to the community the false allegation that Licht is or has engaged in fraudulent activity or other professional impropriety.

253.    Plaintiff has suffered actual damages and/or special harm including monetary and/or out of pocket loss caused by the Defendants' defamations.

254.    Licht has suffered general damages as a result of Defendants' defamations including loss of reputation, anxiety, emotional distress, and sleeplessness.

255.    Defendants acted negligently, recklessly, wantonly, willfully, deliberately, and/or maliciously.

256.    Defendants' conduct is not privileged. In the alternative, to the extent a privilege may apply, Defendants have abused that privilege.

## COUNT XII
## Restitution

257.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 149 of this Complaint.

258.   When Plaintiff authorized stock issuance based on statements and documentation provided by Defendants, he did so under a mistaken factual belief.

259.   This belief was mistaken because the stock issuance requests, statements, opinion letters, and/or documents and/or representations submitted to Plaintiffs were false, misleading, inaccurate and/or fraudulent.

260.   If Plaintiff had known the facts set forth in the preceding paragraphs, it would not have authorized issuance of stock to Defendants.

261.   Plaintiff is entitled to recover from Defendants, each of who have been unjustly enriched, in an amount equal to the amount of sold Simulated stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, demands judgment against all Defendants jointly and/or severally as follows:

a)   Awarding damages suffered by Plaintiffs as a result of the wrongs complained of herein, together with appropriate interest in an amount exceeding $75,000.00 for every Count stated herein;

b)   Awarding Plaintiff compensatory damages, where appropriate, suffered as a result of the wrongs complained of herein;

c)   Awarding Plaintiff consequential damages, where appropriate, suffered as a result of the wrongs complained of herein;

-52-

d)      Awarding Plaintiff exemplary damages, where appropriate, suffered as a result of the wrongs complained of herein;

e)      Awarding Plaintiff punitive damages, where appropriate, suffered as a result of the wrongs complained of herein;

f)      Awarding Plaintiff treble damages, where appropriate, suffered as a result of the wrongs complained of herein;

g)      Awarding Plaintiff rescissionary damages, where appropriate, suffered as a result of the wrongs complained of herein;

h)      Declaring that Defendants have been unjustly enriched and imposing a constructive trust to recoup Defendants' unjust benefits and other assets for the benefits of the Plaintiff;

i)      Awarding Plaintiff litigation expenses, costs and disbursements and reasonable allowances for the fees of Plaintiffs' counsel (if any) and experts, and reimbursement of any other expenses associated with this litigation; and

j)      Granting such other and further relief as the Court may deem just, proper, equitable, or warranted by applicable law.


Date:  November 7, 2012                       Respectfully submitted,


                                              Allen Licht, *pro se*
                                              1594 Shoreline Way
                                              Hollywood, FL 33019
                                              Phone: 754-777-8770
                                              Fax: 954-302-8736
                                              E-mail: allenlicht@hotmail.com