UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED by ___ D.C.

JAN 3 0 2013

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – FT. LAUD.

CASE No.: 0:12-cv-62197-WJZ

---

ALLEN LICHT

                                       *Plaintiff*

v.

AJENE WATSON, JAMES GIBBS, ERIC L.
NOVESHEN, YISROEL A. BORNSTEIN, ARYEH
GOLDSTEIN, SAMUEL H. EISENBERG, THERESA
LEE FREY, JEFFREY E. STALLER, CURT KRAMER,
DAVID E. PRICE, TOMER TAL, STEVEN KOIFMAN,
SCOTT H. WILDING, MONICA CHUI-TIRU, AJENE
WATSON, LLC a Florida Limited Liability Company,
ENVISION CAPITAL, LLC a Florida Limited Liability
Company, SCB & ASSOCIATES, LLC a New Jersey
Limited Liability Company, THE TRIPOD GROUP, LLC
a Wisconsin Limited Liability Company, VIRMMAC,
LLC a Michigan Limited Liability Company, HERITAGE
CORPORATE SERVICES, INC. a Florida Corporation,
ASHER ENTERPRISES, INC. a Delaware Corporation,
STOCK STREET CAPITAL, LLC a Florida Limited
Liability Company, and SKYLINE CAPITAL
INVESTMENTS, INC. a Florida Corporation,

                                       *Defendants*

---

## FIRST AMENDED COMPLAINT

### NATURE OF THE ACTION

1.    Plaintiff's claims arise from the massive "pump-and-dump"[1] scheme

perpetrated by Ajene Watson ("Watson") individually, and through his corporation -

---

[1] According to U.S. Securities and Exchange Commission, "pump-and-dump" are the ". . .
schemes, also known as "hype and dump manipulation," involve the touting of a company's
stock (typically microcap companies) through false and misleading statements to the
marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap
stock into the market." See: http://www.sec.gov/answers/pumpdump.htm.

- Ajene Watson, LLC -- that was specifically formed for fraudulent activities and as an alter ego of Watson. Watson, in conspiracy with other Defendants, stole and misappropriated millions of dollars for personal enrichment and hundreds more to perpetuate the scheme.

2.     Watson did not act alone. Watson deployed a web of individuals, companies, and attorneys throughout the United States. These companies and individuals, in tandem, participated and profited with Watson in the "pump-and-dump" scheme. These individual and companies participated with Watson in what was effectively one integrated and coordinated operation. Many of these corporations had no offices, employees, or existence, aside from corporate form and some temporary or Post Office Box address.

3.     To maintain the deception Defendants, and their associates used prominent (but temporary) Wall Street and other addresses and promoted themselves as sophisticated management and accredited financial services companies.  However, instead of helping unsuspecting companies, Defendants simply sought to defraud the client-companies, the client-companies' employees, and individual street investors.

4.     The Defendants, in circumvention of applicable securities laws and regulations, invented a scheme to illegally create millions of free-trading shares of Simulated's stock for sale in the open market and personal profit.

5.     To facilitate the scheme, the Defendants used attorneys for its stock acquisition transactions. These attorneys issued many opinion letters to stock

transfer agent for Simulated whose stock these Defendants acquired. The opinion letters were required by Defendants to obtain free-trading stock, without restrictive legend on the stock certificates that allowed them to easily sell the shares to the public, in the open markets.

6.      These attorneys played a necessary and substantial role in Defendant's scheme, and thus also violated the securities laws.

7.      Plaintiff and hundreds of other investors were duped by the Defendants and suffered damages.

8.      As direct consequence of Defendants' actions, and as additional cause of Licht's damages, Simulated was reduced to marginal business activity; it lost the trust of its business associates, its product re-sellers, and investors.

9.      During all times relevant to this complaint, Plaintiff Licht was the foremost contact with Defendants. Defendants have lied, misrepresented facts, deceived, elicited promises, and used Licht's good name in business community to perpetuate their fraud.

10.      Plaintiff Licht, who jointly with his wife ones stock of Simulated, has suffered personal damages, which are greater than $75,000 (an actual amount to be proven at trial). Defendant's actions caused Plaintiff to suffer financial loss associated with deliberately depressed stock price, loss of credibility, embarrassment, as well as other damages.

11.      Furthermore, the debt-laden Simulated could no longer obtain necessary funding; and, the reduced business activity, coupled with outrage from

injured investors, prevented Simulated, Licht and other management to obtain needed financing to continue operations and fund the payroll obligations.

12.     Defendants' actions impugned Plaintiff's integrity with broad business community, caused direct financial loss, and caused defamation to the Plaintiff and others.

13.     According to specific statements in §§ 10 through 12 and other instances throughout this Complaint, Plaintiff Licht is direct and third party beneficiary of any commercial activity associates with Simulated. Independent of his duties at Simulated, Plaintiff has standing to sue Defendants for all torturous conduct alleged in this Complaint.

14.     In addition to allegations in §13, Plaintiff Licht, as a first and a third party beneficiary, has standing to sue Defendants because he was the only direct source of contact between Simulated and Defendants and was directly injured by the Defendant, both financially as well as in personal reputation.

15.     Documentary evidence uncovered by Plaintiff shows that Defendants' conduct is not isolated to this matter alone. Various filings with SEC proffer repeated pattern of Defendants' similar activity. Documentary evidence shows that the Defendants involvement leaves the trail of decimated companies, injured management, and injured investors.

16.     Through the activities alleged in this Complaint, all Defendants participated in violation of, among others, Racketeering Influenced and Corrupt Organizations Act (RICO), violations of the antifraud provisions of Section 17(a) of

the Securities Act of 1933 ("Securities Act") [15 USC §77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 USC §78j(b)] and Rule 10b-5 thereunder [17 CFR §240.10b-5].

17.     Furthermore, Defendants and the Defendant Companies violated the registration provisions of Sections 5(a) and 5(c) of the Securities Act [15 USC §§77e(a) and (c)].

### PARTIES

#### A.     PLAINTIFF

18.     Plaintiff, Allen Licht ("LICHT") is a resident of Florida. At all times relevant to this complaint, Licht was the Managing Director and Chief Operations Officer of Simulated Environment Concept, Inc. ("SIMULATED"). Together with his wife, Plaintiff owns stock of Simulated and he suffered damages as the result of Defendants' actions.

#### B.     DEFENDANTS

19.     Defendant Ajene Watson, a/k/a Ajene Odeluga ("WATSON") is a natural person residing at 150 W. 179th St, Apt 6A, Bronx, NY 10453. Watson is a Managing Member of Ajene Watson, LLC.

The "pump-and-dump" scheme outlined in this complaint is not his first. In addition to Simulated (traded under the symbol SMEV), Watson was or is involved in eDoorways, a Texas company, trading under symbol EDWY; UC Hub Group, Inc., a California company, trading under the symbol UCHB; Oriens Travel and Hotel Management Corporation, a Nevada company, trading under the symbol OTHM.

20.     Defendant, AJENE WATSON, LLC ("WATSON LLC") is a Florida limited liability company with its registered address at Defendant Gibbs home located at 1880 Lorenzo Lane, Oviedo, FL 32765. On information and belief, WATSON LLC was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Watson's liabilities, and for the purposes of receiving payments on his behalf. Lacking a business purpose or independent will of any sort, WATSON LLC served as an alter ego to WATSON, completely beholden to his will.

21.     Defendant JAMES GIBBS ("GIBBS"), is a natural person residing at 1880 Lorenzo Lane, Oviedo, FL 32765. Gibbs is a Registered Agent of WATSON LLC. On information and belief, Gibbs was employed, at all times relevant to this complaint, by Watson and, among other duties, acted as a liaison between Watson and the Transfer Agent, American Registrar & Transfer Company.

22.     Defendant Eric L. Noveshen ("NOVESHEN"), is a natural person residing at 508 Coconut Isle Drive, Ft. Lauderdale, FL 33301. On information and belief, at all times relevant to this complaint, Noveshen is associated with Watson and acted as a liaison between Watson and the Defendant Price. Among other duties, Noveshen acted as "the-man-on-the-ground" in Florida.

23.     Defendant, Envision Capital, LLC ("ENVISION") is a Florida limited liability company with its registered address at home of Noveshen, located at 508 Coconut Isle Drive, Ft. Lauderdale, FL 33301. Defendant Noveshen is the Registered Agent. On information and belief, ENVISION was employed, at all times

-6-

relevant to this complaint, exclusively for the purposes of paying monies to settle Noveshen's liabilities, and for the purposes of receiving payments and shares of stock on his behalf. Lacking a business purpose or independent will of any sort, ENVISION served as an alter ego to Noveshen, completely beholden to his will.

24.    Defendant Yisroel A. Bornstein ("BORNSTEIN") is a natural person, a citizen of the State of New Jersey, residing at 36 High Street, Lakewood, NJ 08701. On information and belief, at all times relevant to this complaint, Bornstein was associated with Watson and assisted Watson in the scheme. Bornstein served as a liaison between Watson and Tripod, Goldstein, Eisenberg, Asher, and Kramer.

25.    Defendant, SCB & Associates, LLC ("SCB") is a New Jersey limited liability company with its registered address at Defendant Bornstein's principal address. Defendant Bornstein is the Registered Agent. On information and belief, SCB was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Bornstein's liabilities, and for the purposes of receiving payments and shares of stock on his behalf. Lacking a business purpose or independent will of any sort, SCB served as an alter ego to Bornstein, completely beholden to his will.

26.    Defendant Aryeh Goldstein ("GOLDSTEIN") is a natural person, a citizen of the State of New York, residing at 38 Olympia Lane, Monsey, NY 10952. On information and belief, at all times relevant to this complaint, Goldstein is the *de facto* manager of Tripod directly associated with Defendants EISENBERG and TRIPOD.

27.    Defendant, The Tripod Group, LLC ("TRIPOD") is a Wisconsin limited liability company with its registered address at 250 E. Wisconsin Avenue, Milwaukee, WI 53202. Defendant Eisenberg is the Registered Agent. On information and belief, Tripod was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Goldstein's and Isenberg's liabilities, and for the purposes of receiving payments and shares of stock on their behalf. Lacking a business purpose or independent will of any sort, Tripod served as an alter ego to Goldstein and Eisenberg, completely beholden to their will.

28.    Defendant Samuel H. Eisenberg ("EISENBERG") is a natural person, a citizen of the State of Florida, residing at 3411 Indian Creek Drive, Apartment 403, Miami Beach, FL 33140. On information and belief, at all times relevant to this complaint, EISENBERG was directly associated with Defendants GOLDSTEIN and TRIPOD.

29.    Defendant Theresa Lee Frey ("FREY"), also known as Theresa Graef, is a natural person, a citizen of the State of Michigan, residing at 1123 Wiltshire Drive, Lapeer, MI 48446. On information and belief, at all times relevant to this complaint, FREY was directly associated with Defendants WATSON and VIRMMAC.

30.    Defendant, Virmmac, LLC ("VIRMMAC") is a Michigan limited liability company with its registered address at home of Defendant FREY, 1123 Wiltshire Drive, Lapeer, MI 48446. On information and belief, VIRMMAC was employed, at all times relevant to this complaint, exclusively for the purposes of

paying monies to settle Frey's liabilities, and for the purposes of receiving payments and shares of stock on her behalf. Lacking a business purpose or independent will of any sort, VIRMMAC served as an alter ego to Frey, completely beholden to her will.

31.    Defendant Jeffrey E. Staller ("STALLER") is a natural person, a citizen of the State of Florida, residing at 3040 Canterbury Drive, Boca Raton, FL 33434. On information and belief, at all times relevant to this complaint, STALLER was directly associated with Defendants WATSON and HERITAGE.

32.    Defendant, Heritage Corporate Services, Inc. ("HERITAGE") is a Florida corporation with its registered address at home of Defendant STALLER, located at 3040 Canterbury Drive, Boca Raton, FL 33434. On information and belief, HERITAGE was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Staller's liabilities, and for the purposes of receiving payments and shares of stock on his behalf. Lacking a business purpose or independent will of any sort, HERITAGE served as an alter ego to Staller, completely beholden to his will.

33.    Defendant Curt Kramer ("KRAMER"), also known as Kurt Cramer, is a natural person, a citizen of the State of New York, residing at 6 Evergreen Way, Glen Head, NY 11545. On information and belief, at all times relevant to this complaint, KRAMER was directly associated with WATSON, ASHER and TRIPOD Defendants.

34.    Defendant, Asher Enterprises, Inc. ("ASHER") is a Delaware corporation with its registered agent W/K Incorporating Services, Inc. located at

3500 South DuPont Highway, Dover, DE 19901. On information and belief, ASHER was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle KRAMER'S liabilities, and for the purposes of receiving payments and shares of stock on their behalf. Lacking a business purpose or independent will of any sort, ASHER served as an alter ego to Defendant Kramer, completely beholden to his will.

35.     Defendant David E. Price, ("PRICE") is a citizen of the State of Maryland residing at 13520 Oriental Street, Rockville, MD 20853. PRICE is an attorney licensed in Maryland and District of Columbia and owns the Law Offices of David E. Price located at the same address as his residence. Price represented SIMULATED, as well as, among others, Defendants WATSON, NOVESHEN, ASHER, and KRAMER.

36.     Defendant Tomer Tal, ("TAL") is a citizen of the State of California. Tal is an attorney licensed in California and owns the New Venture Attorneys, a California Professional Corporation located at 900 East Hamilton Avenue, Ste. 100, Campbell, CA 95008. Among others, Tal represented Defendants TRIPOD, STOCK-STREET, and SKYLINE in its acquisitions of securities from SIMULATED as well as other companies quoted on the Pink Sheets.

37.     Defendant Stock Street Capital LLC ("STOCK STREET"), is a Florida limited liability company with a principal place of business at 20423 State Route 7, #341, Boca Raton, Florida 33498 and its registered agent is Defendant KOIFMAN, with registered address at his home.

38.    Defendant Steven Koifman ("KOIFMAN") is a natural person residing at 18939 Concerto Drive, Boca Raton, FL 33498. Koifman was a registered stockbroker from 2002 until 2008. At all times relevant to the Complaint, Koifman was president of STOCK-STREET. On information and belief, STOCK-STREET was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Koifman's liabilities, and for the purposes of receiving payment on his behalf. Lacking a business purpose or independent will of any sort, STOCK-STREET served as an alter ego to Koifman, completely beholden to his will.

39.    Defendant Skyline Capital Investments, Inc. ("SKYLINE"), is a Florida corporation with a principal place of business at 688 NW 156th Avenue, Pembroke Pines, FL 33028 and SKYLINE registered agent is Defendant WILDING, with the same registered address, at his home.

40.    Defendant Scott H. Wilding ("WILDING") is a natural person residing at 688 NW 156th Avenue, Pembroke Pines, FL 33028. At all times relevant to this complaint, Wilding was the president of SKYLINE. On information and belief, SKYLINE was employed, at all times relevant to this complaint, exclusively for the purposes of paying monies to settle Wilding's liabilities, and for the purposes of receiving payment on his behalf. Lacking a business purpose or independent will of any sort, SKYLINE served as an alter ego to Wilding, completely beholden to his will.

41.    Defendant Monica Chui-Tiru ("CHUI") is a natural person residing at 100 Van Courtland Park S., Apartment B14, New York, NY 10463. At all times

relevant to this complaint, was employed by WATSON. Her duties included bookkeeping, stock trading, and administration of various trading accounts for WATSON.

### JURISDICTION AND VENUE

42.    Jurisdiction is proper in this court as to Plaintiff pursuant to 28 USC §1332 because the conflict underlying this suit is between citizens of different States and Plaintiff has pled damages in excess of $75,000 exclusive of interest and costs.

43.    Jurisdiction is also proper pursuant to 28 USC §1331, because Plaintiff has alleged that Defendants engaged in a fraudulent scheme and in breach of, among others, Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; as well as, based upon the Racketeering Influenced and Corrupt Organizations Act, 18 USC § 1961(1)(D).

44.    This Court has personal jurisdiction over the Defendants pursuant to 18 USC §1965 and the Florida Long-Arm Statute, Fla. Stat. §48.193.

45.    Jurisdiction is also proper pursuant to 28 USC §1367, this Court has supplemental jurisdiction over Plaintiff's additional claims arising under Florida law, including, among others, fraud, negligent misrepresentation, general negligence, unjust enrichment, and violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

46.    The Court has jurisdiction over this action pursuant to Section 21D of the Securities Act [15 USC §77v], in connection with the acts, practices, and courses

of business alleged herein, Defendants, directly or indirectly, made use of the means and instruments of transportation and communication in interstate commerce and the mails.

47.     Venue is proper in this district pursuant to 28 USC § 1391 and 18 USC § 1965, as well as, pursuant to Section 22(a) of the Securities Act [15 USC § 77v(a)] and Section 27 of the Exchange Act [15 USC § 78aa].

48.     This Court has personal jurisdiction over all Defendants in that each Defendant participated directly or aided and abetted the illegal activities described herein, carried on a business or business venture in Florida, committed a tortious acts within Florida and/or caused injury to persons within Florida arising out of acts or omissions by Defendants outside Florida. Moreover, many of the Defendants engage in substantial and not isolated activity within Florida.

49.     Defendants, directly and indirectly, have made and continue to make use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices and courses of business alleged herein in the Southern District of Florida and elsewhere.

**DEFENDANTS WRONGFUL CONDUCT**
**GENERAL ALLEGATIONS**

50.     At all times relevant to this Complaint, Defendants falsified information, mislead Plaintiff and Simulated's management members, as well as other general investors. Defendants produced fraudulent documents and/or made fraudulent representations that were intended to generate money for themselves and induced personal loss for the Plaintiff.

51.     These false, misleading, inaccurate and/or fraudulent statements and/or documents and/or representations were intended, and continue to be intended, to assist in obtaining good-will from the Plaintiff in order to obtain shares of Simulated's stock for sale by Defendants.

52.     These false, misleading, inaccurate and/or fraudulent statements and/or documents and/or representations did cause Plaintiff to approve issuance of shares of Simulated's stock to the Defendants.

53.     The conspiracy and scheme, as outlined herein and, upon information and belief, is ongoing. Funds from the Defendant sales of Simulated's stock were paid and distributed to the individual Defendants, and/or other individuals and/or entities.

54.     Defendants established and/or operated shadow companies (among others, Watson LLC, Tripod and Asher) and money from this conspiracy and scheme to defraud, were transferred directly to individual Defendants.

55.     In distributing Simulated's stock to the public market, individual Defendants and Defendants Corporations, acted as brokers by participating in securities transactions at key points in the chain of distribution.  In fact, most of the Simulated's stock that reached the public market was funneled through the Defendants.

56.     Defendants also acted as dealers in Simulated's stock by, among other things, participating in an underwriting with respect to that stock and demonstrating a willingness to sell Simulated's stock on a continuous basis.

Defendants also received dealer-type compensation, profiting on the spread between the deeply discounted purchase price and the price at which the shares were ultimately sold in the open market. However, none of the Defendants were ever registered with the SEC as brokers or dealers.

57.    Upon information and belief, Watson received additional monetary payments as kickbacks for facilitating lucrative acquisition of deeply discounted Simulated's stock. Defendants sold Simulated's securities as part of a kickback/payment arrangement and not as a traditional investment practice. Defendants' actions were geared to helping the scheme and conspiracy.

58.    It was a further part of the conspiracy and scheme to defraud that false, fraudulent, misleading, and/or inaccurate, statements, and/or documents and/or representations were created, produced, and/or sent, directly or indirectly, by Defendants to Plaintiff and/or Simulated's Transfer Agent to induce and/or deceive Plaintiff and the Transfer Agent into making improper and/or incorrect insurance of Simulated's securities.

59.    Defendants mailed to Plaintiff and Simulated's Transfer Agent various stock issuance requests, statements, opinion letters, and/or documents and/or representations. Defendants did so with the knowledge that the stock issuance requests, statements, opinion letters, and/or documents and/or representations would be relied upon by Plaintiff and Transfer Agent in making stock issuances.

60.    Additionally, these stock issuance requests, statements, opinion letters, and/or documents and/or representations were false, fraudulent, misleading,

and/or inaccurate as they inaccurately reflect and/or misrepresent the true intent of the transactions and are not supported by law.

61. Defendants mailed stock issuance requests, statements, opinion letters, and/or documents and/or representations in their individual names and/or in the names of the Defendants' Corporation and further utilized Defendants Attorneys to create legitimacy for the requests.

62. Plaintiff reasonably relied upon representations set forth on Defendants' statements and/or other documents for approving issuance of Simulated's stock.

63. Upon information and belief, the stock issuance requests, statements, opinion letters, and/or documents and/or representations Defendants were intended to extract free-trading stock from Plaintiff and Simulated for further distribution and sale to unsuspecting investors in Florida and other States in violation of Florida Securities and Investor Protection Act ("FSIPA") Fla. Stat. §517 and other applicable Florida Law.

64. In reasonable reliance on and in belief of the accuracy of the stock issuance requests, statements, opinion letters, and/or documents and/or representations issued by or on behalf of Defendants and/or the Defendant Corporations, Plaintiff authorized stock issuance to the Defendants. Furthermore, Plaintiff incurred damages by making stock issuance to the Defendants.

65. In furtherance of and for the purpose of executing the conspiracy and scheme to defraud, Defendants, on numerous occasions, used and caused to be used

mail depositories of the United States Postal Service and wires by both placing and causing to be placed letters, stock issuance requests, statements, opinion letters, and/or documents, and/or other mailable matter in said depositories and by removing and causing to be removed letters and other mailable matter from said depositories and/or by the use of facsimile machines, and/or by the use of e-mail.

66.     Documents attached as exhibits to this Complaint are a small representation of total documentary evidence. Other false, fraudulent, misleading, and/or inaccurate documents, and/or records that were sent by Defendants will be revealed and disclosed during discovery in this matter.

67.     Each use of the mails and wires in connection with the scheme and artifice to defraud constitutes the offense of mail and wire fraud as proscribed and prohibited by18 USC §1343.51. In connection with the activities of all Defendants giving rise to this action, all Defendants conspired to engage in the various activities and aided and abetted one another in the said activities as described herein.

68.     In connection with the activities of all Defendants giving rise to this action, the Defendants acted with malice, intent and knowledge. The Defendants knew that the stock issuance requests, statements, opinion letters, and/or other documents were false and that the false submissions would be relied upon by Plaintiff when making stock issuances.

69.   At all times relevant hereto, Defendants knew, or should have known, that Plaintiff was relying on the truth and accuracy of Defendant' stock issuance requests, statements, opinion letters, and/or other documents.

70.   The scheme to systematically defraud Plaintiff by submitting, through the mail, stock issuance requests, statements, opinion letters, and/or other documents which were false and inaccurate, was facilitated, aided and assisted with the cooperation, assistance and allegiance of attorneys Price and Tal.

71.   Each predicate act (e.g. the submission of each false stock issuance request, statement, opinion letter, and/or document via US Mail) was committed with the same purposes (to induce stock issuance from Plaintiff and for Defendants' personal gain), the same result (the actual collection of payments from Plaintiff for the benefit of Defendants), the same participants (the individual Defendants, as well as the Defendant Corporations), the same victims (Plaintiff and other Simulated's Management Members), and the same method of commission (submitting stock issuance requests, statements, opinion letters, and/or documents, and ultimate sale of securities on the open market).

72.   Plaintiff allege that each predicate act was related to the others insofar as each one was the result of a common plan, consistently applied using standard practices, and producing a consistent result.

73.   It was a further part of the conspiracy and scheme that the Defendants fraudulently concealed their involvement in the conspiracy and scheme and concealed the conspiracy and scheme as described herein.

74.     During the relevant times, in connection with the activities of the Defendants giving rise to this action, Defendants intentionally acted to fraudulently conceal the nature of their activities in order to insulate themselves from liability for the fraudulent and illegal activities they were undertaking, in a manner that a reasonable person would believe their assertions and comply with Defendants' stock issuance requests.

75.     Due to the concerted efforts of all Defendants to conceal their fraudulent activities and despite the exercise of reasonable diligence by Plaintiff, Plaintiff did not discover the injury and its source until after January of 2012. Plaintiff's exercise of reasonable diligence included, but is not limited to, review and evaluation of requests, which included but was not limited to, the review the supporting records submitted by the Defendants, as well as reliance on legal opinions issued by Tal and Price.

76.     All individual Defendants deceived Plaintiff to believe that he was dealing with Defendants as individuals, and that the named Defendants Corporate entities were merely the proxies by which the transaction would be executed.

77.     Plaintiff did not believe that he was dealing directly with the corporate defendants, but rather that he was in privity with Individual Defendants, to whom Corporate Defendants were entirely subservient.

78.     Individual Defendants did nothing to dissuade Licht of this perception.

79.     To perpetuate his deception, Defendant Kramer owns and operates, among other, multiple corporate entities, specifically: ASHER ENTERPRISES<

INC., active Delaware Corporation; DIAMOND REMARK, INC., active Texas Corporation; HOPE CAPITAL, INC., active New York Corporation; KBM CONSULTANTS, INC., dissolved New York Corporation; MAZUMA CORPORATION, active New York and Minnesota Corporation; MAZUMA ENTERPRISES, INC., active California Corporation; MAZUMA FUNDING CORPORATION, active New York Corporation; MAZUMA HOLDING CORPORATION, active Texas Corporation; and REMARK PRODUCTIONS INC., active New York Corporation.

80.     Most importantly, Defendant Kramer has complete control and ownership of XXR CONSULTING, INC. wherein his wife, Maritsa Kramer[2], is listed as direct employee. XXR is registered (with various activity status) in States of New York, Texas, and Colorado.

81.     In an attempt to hide his ownership of the active XXR Texas Corporation, Defendant Kramer has deliberately transposed first letters of his first and last name to list as Kurt Cramer instead of usual, Curt Kramer.

82.     In concert with other Defendants, Goldstein and Eisenberg operate, among others, THE TRIPOD GROUP, LLC, active Limited Liability Company registered in Wisconsin, Florida, and Nevada; PROLIFIC GROUP, LLC, active Limited Liability Company registered in Wisconsin; PORTFOLIO INVESTMENTS STRATEGIES CORPORATION, active New York Corporation.

---

[2] Curt Kramer lives in a $5,000,000 (five million dollars) mansion in Long Island, NY and enjoys very expensive vehicles such as $250,000 Bentley Continental and $100,000 Mercedes Benz S550. His mansion is registered in his wife's name whose listed employment is XXR Corporation. On information and belief, Marisa B. Kramer assists Defendant Kramer in shielding his assets and perpetuation of the fraud.

83.     Defendant Ajene Watson, together with other Watson Defendants, owns and operates, among others, AJENE WATSON, LLC., active Limited Liability Company registered in Florida; THE ROVER PROJECT, LLC., inactive Limited Liability Company registered in Florida; as Ajene Odeluga, defendant Watson was involved in EZBANC CORPORATION, inactive Florida Corporation.

84.     Defendant Price is associated with many corporations – in some, he is just a registered agent, in others, he is an active corporate officer. For example, WIKIFAMILIES INC, DAULTON CAPITAL CORP, NHS HEALTH SOLUTIONS, INC, EAST COAST DIVERSIFIED CORPORATION, THE LAW OFFICES OF DAVID E. PRICE, PC, and many others.

85.     Defendant Tal is also associated with many corporations – in some, he is just a registered agent, in others, he is an active corporate officer. For example, NEW VENTURE ATTORNEYS PC, ANONYMOUS TECHNOLOGY CORPORATION, NUCO DISPOSAL, LLC, NUCO WATERFLOOD, LLC, SEMPER PERVIGILIS CORP, and many others.

86.     Defendant Bornstein is associated with SCB ASSOCIATES, LLC. and THERAPEUTICS UNLIMITED, INC.

87.     Furthermore, all other defendants have multiple corporations registered in their names or actively affiliate with other corporations. Defendant Staller owns or associated with at least three corporate entities; Defendant Koifman owns or associates with at least six corporate entities; Defendant Wilding owns or

associates with at least nine corporate entities; and Defendant Noveshen owns or associates with at least four corporate entities.

### Watson Group Defendants Wrongful Conduct

88.    As set forth below, Watson and his associates have organized, instigated and orchestrated the scheme.

89.    The Watson Group Defendants are Watson, Gibbs, Noveshen, Bornstein, Chui-Tiru, Watson LLC, SCB, and Envison.

90.    Watson Group served as the manager, controller, and illegal distributor (unregistered broker) of Simulated's stock to the selling Defendants and public market.

91.    Neither Watson nor any of the members of Watson Group are registered broker-dealers.

92.    As referenced below in §§ 93 through 102, the Watson Group Defendants were in the center of all illegal transactions. Including, but not limited to, creation of illegal free-trading shares, orchestration of pump-and-dump scheme, and coordination of all fraudulent acts and efforts.

### Tripod, Asher, StockStreet, Skyline, Goldstein, Eisenberg, Kramer, Koifman, and Wilding Defendants Wrongful Conduct

93.    As outlined in greater detail below, these Defendants have participated in the "pump-and-dump" scheme with Watson Defendants and were assisted by Attorney Defendants.

94.     Instead of legally investing into companies, these Defendants routinely received deeply discounted stock and immediately sold the securities on the open market for substantial personal enrichment.

95.     These Defendants assisted Watson in illegally obtaining hundreds of millions deeply discounted securities of Simulated. Among many other transactions, Defendants assisted with illegal issuance of 100,000,000 (one hundred million) Simulated's shares, which were then transferred from Watson back to these Defendants and dumped on the open market.

96.     These Defendants knew that the issued shares were not free trading. These Defendants, together with Defendants Attorneys, have acted with scienter and malice in their collusion to circumvent existing rules for issuance of illegal free-trading shares – all for their personal gain and enrichment.

97.     While participating in issuance, or receipt, or disposition of illegally obtained shares of Simulated's stock (some of the specific instances outlined in § 169, below) these Defendants acted with intent to deceive, manipulate, and defraud the Plaintiff.

98.     These Defendants and Defendants Attorneys acted with deliberate and severe recklessness which cannot be excused as omission or even inexcusable negligence.

99.     In creating, out of thin air, illegally issued free-trading shares, the Defendants and Defendants Attorneys, acted with deliberate disregard and had to be aware of their actions.

100.   Furthermore, in perpetuation of their fraud, these Defendants maintained (and continue to maintain) multiple stock-trading accounts and operate their own unregistered "stockbrokerage" services that permit rapid sell-off, short-selling, and other stock-related machinations.

101.   In doing so, these Defendants circumvented the registration process and acted as a conduit to dump shares of micro-cap companies on the public markets and on unsuspecting investors, thereby depressing the Stock price of Simulated and causing injury to Plaintiff.

102.   While representing themselves as accredited investors, these Defendants are not accredited; they routinely engage in a lucrative "run-around" of an important disclosure policy underlying the securities laws.

### Virmmac, Herritage, Frey, and Staller Defendants Wrongful Conduct

103.   These Defendants have illegally profited from the "pump-and-dump" scheme by providing inflated and inaccurate information to the outside investors and serving as conduits to dissemination of press releases and inaccurate information.

104.   Defendants Frey and Staller have regularly conspired with Watson Defendants and produced inaccurate and inflammatory press releases and web posts.

105.   Defendants Frey and Staller have repeatedly ignored the red flags surrounding Watson and others, and played an important role in dissemination of inaccurate information.

-24-

## Attorney Defendants Wrongful Conduct

106.    Incorporating statement in §§ 1 through 102, Defendants Tal and Price were the outside council for stock acquisition transactions by all Defendants and served as an integral part in the scheme to defraud.

107.    None of the transactions referenced in this complaint would be possible without full knowledge, participation, and deliberate actions of these Defendants.

108.    While personal friends[3] and longtime associates with other Defendants, theses Attorney Defendants issued multiple Opinion Letters to facilitate removal of restrictive legend from stock certificates as well as assisted in transfer and deposit of stock.

109.    Attorney Defendants knew that the Defendants intended to dump the shares immediately and without appropriate registration required by the provisions of Section 5 of the Securities Act and/or Florida State Law.

110.    Attorney Defendants pretended to serve the interests of Simulated and the Plaintiff. However, the services of these attorneys were retained and paid for by other Defendants, for their personal gain.

111.    By issuing Opinion Letters which facilitated improper lifting of restrictions from the stock certificates, these Attorneys aided and abetted other Defendants in the scheme, as well as directly participated in conspiracy and scheme to defraud Plaintiff and others.

---

[3] For at least five years, Tal is working with Tripod, Eisenberg and Goldstein; Price is personal friend of Noveshen and Watson, he assisted them with other companies and transactions.

112.   Attorney Defendants participated in and facilitated multiple strategy sessions designed to circumvent the registration process and permit the Defendants dumping of the securities.

113.   Attorney Defendants facilitated and engaged in a sophisticated "run-around" of an important disclosure policy, among others, Rule 144 of the Securities Act [17 CFR 230], underlying the securities laws.

## RELATIVE BACKGROUND FACTS
### The anatomy of a "pump-and-dump" scheme.

114.   The "pump-and-dump" scheme requires stock-market expertise and several participants acting in concert to effectuate the fraud.

115.   Firstly, one has to find an underperforming or struggling, publicly trading company (in current economic conditions – it is not difficult).

116.   Secondly, the fraudster must convince the management that he can get them the funds and management expertise they need to grow and support their business.

117.   Thirdly, begin to acquire the stock positions and obtain from the target-company deeply discounted stock.

118.   Fourthly, position the Public Relations surrogates on multiple public and internet-based bulletin boards dedicated to investing in penny-stocks[4].

119.   Start pumping-up the news about the company's products or services.

---

[4] There are 829,000 Google results for the search-term "penny stocks bulletin board." There are literally thousands of different boards that attract millions of penny-stock investors.

-26-

120.   The "news" stories and Public Relations surrogates, together with clever stock manipulation[5] that creates appearance of trade-volume, attract new and unsophisticated investors who feel they are buying "hot" stock.

121.   At the opportune moment, begin "dumping" the stock into the market and collect a windfall profits from ill-gotten stock.

122.   Keep bating the company's management with promises and occasional funds to get more deeply discounted stock.

123.   Once done, move-on to the next company.

**FACTS**

124.   In February of 2008, Defendant Aryeh Goldstein personally contacted Plaintiff Licht. On his personal initiative as well as on behalf of Defendants Eisenberg and Tripod, he came to visit Licht at Simulated's offices located at 20229 NE 15th Court, Miami, FL 33019.

125.   At that meeting, and subsequent telephone conversations, Goldstein presented himself as an honest businessman and an accredited investor who represents a Wisconsin company interested in long-term investment with Simulated.

---

[5] Typically, these "pump-and-dump professionals" have multiple trading accounts and relationships with broker-dealers. They can shift large blocks of stocks between accounts that creates appearance of large trading volume. Some investors are looking for large trading volume as criteria for investing. The defendants Goldstein, Eisenberg, Kramer, Asher and Tripod have their own, high volume stock trading departments. For Tripod, their department is staffed by a "Mendle" and "Goldie." Defendant Chow-Tiru was the trader for Watson. She travels with a laptop and is capable of moving or acquiring stock from any location with WiFi internet connection.

126.    At subsequent meetings and telephone conversations, Goldstein reiterated his long term investment strategy and personally assured Plaintiff that if investment is made, the collateral shares will not be hastily sold into the open market and that neither Goldstein, Eisenberg, Tripod, or any other associates will not engage in "short-selling," or other injurious machinations with Simulated's sock.

127.    Goldstein indicated that he had authority to engage Tripod and Eisenberg in a binding contract with Simulated and assured Licht that he will be working closely with Licht and Simulated towards mutual success.

128.    Goldstein new that Plaintiff Licht and his wife are beneficiaries of Simulated's stock and Simulated's commercial activities. In order to gain sufficient trust of Plaintiff Licht, Defendant Goldstein, on behalf of himself, Eisenberg, Kramer Defendants, Tripod, Asher, Bornstein, and Watson Defendants promised that under no circumstances would the Defendants (individually or collectively) take action that would have adverse effect on the trading price or volume of Simulated stock, which, if happened, would result in an injury to Plaintiff Licht.

129.    In early Spring of 2009, Defendant Aryeh Goldstein again contacted Allen Licht with an introduction to Watson Defendants (and subsequently to Kramer Defendants), who were presented as a "successful" business managers who have a pattern of assisting emerging companies with appropriate funding and business expertise to leverage company's technology and existing network of distributors for funding and growth.

-28-

130.    In May of 2009, after several phone calls, Ajene Watson was joined by Defendant Eric Noveshen for an initial meeting between the Plaintiff Licht and others from Simulated management. The meeting took place at the Simulated's office located at 20229 NE 15th Court, Miami, FL 33021. Watson and Noveshen represented all Defendants and spoke in global terms of "our group," "individuals and companies associated with us," and other similitudes.

131.    At the meeting, the management has disclosed the realistic picture of Simulated's financial conditions. The initial due-diligence was subject of deliberate scrutiny and extensive analysis.

132.    After the initial meeting Watson, in the e-mail of June 3, 2009, writes:

"... *We'd like to determine fairly quickly what if anything we're able to do; engage and move forwarded immediately if we find that we can indeed bring real value to Simulated Environment Concepts.*" (See Exhibit "A")

133.    Subsequently, Watson, in concert with Bornstein, Goldstein, Noveshen and Kramer, craftily convinced Allen Licht that Watson's group will be consulting Simulated towards success, for mutual benefit. Watson's group will assist in shaping the company to build-on its achievements, to expand in marketing, manufacturing, and distribution of Simulated's product.

134.    Mr. Watson was very convincing. In his e-mail of June 17, 2009 he wrote:

"... *I wish to report that we're on what I believe is the last leg of crafting what we hope is the most reasonable operation-capital deal going into [Simulated]. It is important that we know we can make an adequate amount of money available to the [Simulated] effort in order to accomplish what the company will require.*"

In the same e-mail Mr. Watson continued,

> "... It seems as though all parties are intently interested in the [Simulated] opportunity and as you may or may not have noticed, are beginning to **position themselves accordingly**. As a team, we believe strongly that we can assist you in capturing what you originally came to the public markets to get... and then some. (emphasis added)"

The words "**position themselves accordingly**" are the stock-market industry code-words indicating that the Watson's associates (the insiders) are now beginning to herd Simulated's stock in an anticipation of sale when the investor relations campaign will cause the stock price to go up. (See Exhibit "B")

135.   To add to his convincing pitch, in the e-mail to Allen Licht, on July 24, 2009, Mr. Watson writes,

> "... First, let me tell you that we have received much greater response from from our summary than expected. Our entire team appears to be very excited about the prospect of working with you and cannot wait to officially get started ... We are certainly looking forward to working with you and [Simulated] and expect to be successful both in the short and long term." (See Exhibit "C")

136.   Throughout this scheme, Watson emphasized "trust" and "honesty." Watson's August 2, 2009 e-mail speaks for itself,

> "... [O]ur attempt is to further provide you with the comfort of knowing that **our objectives are long term**. If you do not see value within the next year' we do not see value. It's just that simple ... Again, I hope this gesture sets the tone for a **trusting** and mutually respectful relationship. Our business model relies heavily on it. (emphasis added)" (See Exhibit "D")

137.   On August 3, 2009 Simulated, by its Managing Director Allen Licht, executed the contract with Watson (see Exhibit "U").

138.   The contract specified that Simulated would pay Watson $255,000 (two hundred and fifty five thousand) retainer and a monthly fee of $67,000 (sixty seven thousand).

139.   It is plainly understood that Simulated was never in the position to pay such retainer, nor did the company ever pay Watson in cash. With a nod-and-wink, Watson suggested to the management that he would be very happy to receive his payment in company's stock or warrants, received at a significant discount to the market price. Therefore, shortly after stock transfers from Simulated to his account, Watson distributed the shares to his group as well as to Tripod, Asher, Goldstein, Eisenberg, Kramer, Wilding, and Koifman, among others, to sell them on the open market and convert them into source of personal enrichment.

140.   Between September of 2009 and August of 2011, Defendants, through Watson, received and sold on the open market over 350,000,000 (three hundred and fifty million) shares of Simulated's unregistered stock. Defendants' regular dumping and short-sales machinations brought them over $3,000,000 (three million dollars) in illegal profits.

141.   On August 11, 2009, Allen Licht is introduced to Defendant James Gibbs. Watson writes, "Please be aware that Mr. James Gibbs, from our office, will likely contact you today regarding the Transfer Agent issue." This e-mail sets into motion the transfer from Simulated's existing Transfer Agent to a new Transfer

Agent (American Stock Transfer and Registrar[6]) that can be controlled and influenced by the Defendants. (See Exhibit "E")

142.   Several weeks later, the "pump" phase of the "pump-and-dump" scheme was initiated; Watson needed to make a public announcement concerning his group's involvement with Simulated. In his e-mail of October 7, 2009 Watson writes:

> *"This is one of the reasons I propose we release this news after its revealed we're expanding another client's credit facility from $500k to $2mm[7]. I believe this will assist us in allowing [Simulated] to gain traction with traders. Not to mention that Dan wants us to put a similar facility in place with [Simulated]. I believe the correlation would become obvious."*(See Exhibit "F")

143.   Additionally, to maintain the small-investor excitement, in September-October of 2009, Watson demands that the company engage QualityStocks group, and later, in January of 2010 – Kennective, LLC; in April of 2010 – InvestorsVoice.com, LLC; in June of 2010 – Keros Capital; in August of 2010 – Stock Street Capital, LLC and Steven Koifman; in September of 2010 – HotShotStock Corporation and Virmmac, LLC; in November of 2010 – Heritage Corporate Services, Inc. and Staller.

144.   Later-on, in May of 2011, Watson demanded that Simulated renew the contracts with HotShotStock Corporation, Virmmac, LLC, and Keros Capital; and

---

[6] Just as Defendant Attorneys, individuals at American Stock Transfer and Registrar were personal friend and confidants of the Defendants, and worked together on other "deals".
[7] This comment is associated with another company – E-Doorways [EDWY], also traded on PinkSheets. Unfortunately, at the hands of Defendants, EDWY has suffered the same fate as Simulated. Its stock was decimated by "pump-and-dump" scheme and they have never seen the credit facility of neither $500,000 nor the $2,000,000. These announcements amounted to nothing more than hype.

establish new and additional contracts with Shareholder Development Group, LLC and Grass Roots Research and Distribution, Inc.

145.    The Public/Investor Relations groups mentioned in §§ 143 through 144 above used various techniques of internet promotions and e-mail blasts to "pump-up" the Simulated's value and its stock price.

146.    As these companies provided the "pump-up" initiatives, Watson continued to entice Licht and Simulated's management with promises. One example: on December 7, 2009 Watson writes,

> ". . . *Our team convened late last night for an hour or so to discuss the best ways to move forward with your company under the current set of circumstances. We have restrategized our original plan and continue to feel just as confident in our ability to provide you with the level of service you require. However, in order to provide our services most effectively, we will need to take more extreme actions to ensure that [Simulated] indeed becomes attractive to investors, self efficient, profitable, an investment worthy stock and a safe place for our lenders to sit capital.*"[8] (See Exhibit "G")

147.    On December 14, 2009, Mr. Watson request that Simulated appoint an attorney, Defendant Price as a corporate secretary. In his e-mail to Licht, Watson writes, "...we will need to appoint a short term Corporate Secretary.  I'd like to use one of our attorneys Mr. David Price to fill this role." Subsequently, Price became an attorney who issued many opinion letters to clear restricted stock and establish the foundation for fraudulent transactions. (See Exhibit "H")

148.    The e-mail of December 15, 2009, clearly places Watson at the head of the scheme (See Exhibit "I"). He continues to weave the web of deception and

---

[8] Please note the absence of any details. The message sounds upbeat and convincing, however, lacking any substance or specificity.

continues to set-up Simulated for the ultimate "pump-and-dump". Here Watson does the following:

    a.  Directs Gibbs to initiate Transfer Agent switch to his preferred vendor, American Registrar and Stock Transfer;

    b.  Directs Noveshen to assist with accounting. At which point, Noveshen installed his mother Sherrill Wilson, as the bookkeeper;

    c.  Confirms installation of attorney Price;

    d.  Directs Vincent Hess to develop Investor Relations website;

    e.  Continues to formulate the message to potential buyers of the pumped-up stock, i.e. "...Trey and I are strategizing on how best to speak to the current shareholder base."

    f.  Together with Noveshen, Watson arranges for the firm of Gersten, Savage to represent the company, in addition to Price[9].

149.   On December 29, 2009, Watson prepares and disseminates, to the national wire services, an "up-beat" press release designed to lure investors and boast his enterprise. (See Exhibit "J")

150.   Much of the time between January and August of 2010 was spent in preparations and updates for OTC Markets disclosures and accounting.

151.   However, in order to facilitate the scheme, Watson had to come-up with a process wherein a large block of Simulated's free trading stock was available at his disposal.

152.   Typically, as described in greater detail in §§155 through 157 below, according to the SEC rules governing stock issuance for the micro-cap companies,

---

[9] At this time, Plaintiff is not aware if Gersten, Savage produced any opinion letters for Simulated's stock issuance.

any new stock issued by Simulated in exchange for cash or services, would have to be "restricted" and held by the purchaser for at least one year before an investor could begin selling the stock on the open market.

153.   To circumvent the process, Watson, Goldstein, Bornstein, and Noveshen arranged to make a token "purchase" of an old and aged Simulated's promissory note portion (Exhibit "K") held by Tripod. Once "purchased," Defendants invented a scheme that would permit them to immediately convert that portion of the note to free-trading shares at the price of $0.0001 (one thousands of a penny) per share, while the actual per-share price during that time was averaging $0.04. Effectively, Defendants acquired 100,000,000 (one hundred million) free trading shares with the street-value at approximately $4,000,000 (four million dollars) for the token cost of $10,000 (ten thousand dollars)[10].

154.   In fact, the conversion and the scheme to convert were illegal and against prevailing SEC rules.

155.   Specifically, acquisition, sale and re-sale of the newly issued shares were subject to  Rule 144 and 145 [17 CFR Parts 230 and 239].

156.   In general, Rule 144 under Securities Act of 1933 states that a selling security holder shall be deemed not to be engaged in a distribution of securities, and therefore not an underwriter, with respect to such securities, thus making available the Section 4(1) exemption from registration, **if the resale satisfies specified conditions** (emphasis added). The conditions include the following:

---

[10] 100,000,000 * 0.0001 = $10,000

      · There must be adequate current public information available about the issuer [17 CFR 230.144(c)];

      · If the securities being sold are restricted securities, the security holder must have held the security for a specified holding period [17 CFR 230.144(d)];

      · The resale must be within specified sales volume limitations [17 CFR 230.144(e)];

      · The resale must comply with the manner of sale requirements [17 CFR 230.144(f) and (g)]; and

      · The selling security holder must file Form 144 if the amount of securities being sold exceeds specified thresholds [17 CFR 230.144(h)].

157.   Furthermore, the Rule 144 "safe harbor" provision is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the Act [17 CFR 230.144].

158.   To facilitate the above transaction (see §153 ), Defendants had to deceive Licht and assure him that the transaction was legal. While assisting Defendants, Licht relied on the representations made by Watson, Goldstein, Eisenberg, Kramer, Bornstein, Noveshen, Price, Tal and others. Licht further relied on these representations when he helped during preparations of legal documents authorizing this transaction and issuance of the stock.

159.   On June 3, 2010, attorney Price, acting on behalf of Watson, has issued an opinion letter paving the way for the above referenced transaction (see §153 ) to consummate (See Exhibit "L").

160.   With assistance from Defendants Goldstein and Eisenberg, Watson completed the transaction and became an owner of 100,000,000 (one hundred million) shares of Simulated's stock worth approximately $4,000,000 (four million

dollars). Though these shares were not free trading in accordance to SEC Rules, as outlined above in Paragraphs 154 through 158, the legal opinion of Defendant Price coupled with "turning-of-the-blind-eye" by American Registrar, paved the way to the scheme.

161.    Sadly, this was just the beginning. Over the term of relationship between Licht, Simulated and Defendants, the Defendants received over 350,000,000 (three hundred and fifty) million shares of Simulated stock.

162.    Effectively, these shares were not owned by Watson alone. The shares were always intended for distribution to all participants in the scheme. All Defendants accepted the discounted shares with full knowledge and lucid understanding of Licht's expectations. With years of experience in the PinkSheets or micro-cap industry, Defendants knew beyond any doubt that they were personally deceiving and injuring Licht while receiving extremely discounted shares. Defendants continued with the pattern of fraud and deception when they promised to invest in and manage a public relations campaign on behalf of the Simulated and to provide Simulated with adequate financing to expand manufacturing, renew the design of its product, invest into marketing, and pay long overdue salary to its managers, including Licht. The transaction simply made no sense otherwise. No rational individual would give-away company's stock, at such discount, without some significant benefit being offered in return.

163.    While enriching themselves, the Defendants deliberately and maliciously failed to deliver on their promises and representation.

164.   Contrary to the promises and representations made to Licht and others, Defendants made no effort to launch a sustained public relations campaign on behalf of the Company or create appropriate foundation for traditional investments. Instead, Defendants began selling their illegally acquired shares as quickly as possible -- in utter disregard of the promises made.

165.   If at any time, Defendants initiated any public awareness campaigns, these were designed to perpetuate their scheme, pump-up the price, maintain street-level interest, and to assist the Defendants in dumping the shares for personal gain.

166.   On July 14, 2010 and September 13, 2010, attorney Price, without ever visiting Simulated or consulting with the management, issued an opinion letter titled "Sufficiency of Adequate Current Information." Before issuing such letter, Price was obligated to make an in-person visit to the client. However, Price never made such visit[11] (See Exhibit "M").

167.   From this point forward, in addition to restricted stock and preferred shares, Watson began demanding from Simulated, issuing and disbursing to the members of his group stock together with illegally acquired free-trading shares received in the fraudulent transaction described in §§ 151 through 160 above (See Exhibit "N").

168.   With the excitement generated by repeated press releases, web posts, and e-mail blasts generated by Public and Investment relations groups, Watson

---

[11] Since July 12, 2010, Price issued numerous opinion letters without a single visit to Simulated, as required by the OTC rules.

colludes with Tripod, Asher, Goldstein, Eisenberg, Kramer, and others to begin the process of selling newly acquired shares to unsuspecting street investors, including investors located in the State of Florida.

169.   The following is only a partial list of free-trading stock issued to and sold by Defendants (See Exhibit "O"):

| | Partial List of Free Trading Stock Issuance to Defendants | | | |
|---|---|---|---|---|
| | Date of Issue | Value of Stock | Number of Shares | Issued To: |
| a. | 9/2/2010 | $114,000 | 6,000,000 | Tripod, Goldstein and Eisenberg |
| b. | 11/30/2010 | 72,000 | 6,000,000 | Asher Enterprises, Inc. and Kramer |
| c. | 12/8/2010 | 39,500 | 5,000,000 | Ajene Watson, LLC |
| d. | 12/8/2010 | 37,525 | 4,750,000 | Ajene Watson, personally |
| e. | 12/15/2010 | 110,000 | 10,000,000 | Asher Enterprises, Inc. and Kramer |
| f. | 12/20/2010 | 36,000 | 4,000,000 | Tripod, Goldstein and Eisenberg |
| g. | 1/4/2011 | 45,000 | 10,000,000 | Asher Enterprises, Inc. and Kramer |
| h. | 1/13/2011 | 130,000 | 20,000,000 | Asher Enterprises, Inc. and Kramer |
| i. | 1/26/2011 | 35,000 | 10,000,000 | Tripod, Goldstein and Eisenberg |
| j. | 2/3/2011 | 78,000 | 20,000,000 | Tripod, Goldstein and Eisenberg |
| k. | 2/8/2011 | 25,000 | 10,000,000 | Asher Enterprises, Inc. and Kramer |
| l. | 3/22/2011 | 69,000 | 32,000,000 | Tripod, Goldstein and Eisenberg |
| m. | 3/28/2011 | 18,200 | 13,000,000 | Tripod, Goldstein and Eisenberg |
| n. | 3/29/2011 | 38,000 | 20,000,000 | Skyline and Wilding |
| o. | 3/29/2011 | 38,000 | 20,000,000 | Stock Street and Koifman |
| p. | 4/29/2011 | 65,385 | 38,461,538 | Tripod, Goldstein and Eisenberg |
| q. | 5/13/2011 | 139,500 | 45,000,000 | Asher Enterprises, Inc. and Kramer |
| r. | 6/17/2011 | 6,440 | 9,200,000 | Ajene Watson, LLC |
| s. | 6/23/2011 | 28,000 | 28,000,000 | Ajene Watson, personally |
| t. | 6/23/2011 | 30,000 | 30,000,000 | Shareholders Developers Group |
| u. | 7/18/2011 | 5,800 | 4,200,000 | Tripod, Goldstein and Eisenberg |
| v. | 8/11/2011 | 7,400 | 6,200,000 | Tripod, Goldstein and Eisenberg |

170.   In addition to shares of Simulated listed in §169 above, there were millions of other shares issued for various services to perpetuate the scheme.

Among others, these were issued to insiders like Hess, Noveshen, Gibbs, Chui-Tiru, and Bornstein; as well as various Public and Investor relations groups who provided marketplace "excitement" and kept small investors bated. Defendants Heritage and Stoller; QualityStocks, LLC; Grass Roots research & Distibution, Inc.; Shareholders Development Group, LLC; Defendants Virmmac, LLC and Frey; and Kermos;

171.    Sometime in March of 2011[12], Watson brought back attorney Tal to the company. Just as Price, Tal provided opinion letters for the Transfer Agent required to clear stock certificates and facilitated other transactions.

172.    Specifically, Tal was involved in March 29, 2011 transaction with Defendants Wilding, Koifman, Stock Street, and Skyline (see §169 above, lines 'n'. and 'o'.)[13]; Note Assignment between Watson and Tripod on April 1, 2011; and, share issuance to Tripod on April 28, 2011 (see §169 line 'p'. and Exhibit "P").

173.    Beginning in April and continuing in May of 2011, Licht and other management members of Simulated began confronting Watson concerning ongoing situation; in numerous telephone conversations and e-mails, Licht expressed company's disappointment, loss of trust with Watson's group, embarrassment and aggravation suffered by Licht due to repeated phone calls from shareholders, as well as defamation suffered by Licht due to public internet posts about Licht and Simulated.

[12] Defendant Goldstein introduced Tal to the company in February of 2008. Upon information and belief, Tal has long and profitable relationship with Tripod, Goldstein, and Eisenberg and stands ready to provide any legal opinion to benefit his benefactors.
[13] Subsequently, as a result of sell-off outlined in the §§175 through 180 below, the transaction was flagged by FINRA and SEC.

174.    On May 23, 2011, Licht sent to Watson, via e-mail, an 11 page document outlining failures of his group as well as loss of trust in the process. At the conclusion of the document Licht writes,

> *"If we are to go on, we must be secure in the process; you must be honest with us and yourself. We must have guaranties of success. You must shape-up and begin to deliver on your promises. We are not interested in staking our future on such a tenuous and untrustworthy process."* (see Exhibit "Q")

175.    In the phone-call conversation on the same day, Licht advised Watson that Simulated intends to stop the relationship with his group.

176.    In response, Watson has issued a scathing reproof (see e-mail from Watson dated Monday, May 23, 2011, marked as Exhibit "R") and scheduled an immediate meeting (a day later, Wednesday, May 25, 2011), to fly-in to Florida to speak to Licht and other managing members of Simulated.

177.    On Wednesday, May 25, 2011, hours before Watson's arrival to Florida, Watson and Staller, without prior authorization from Licht or any other managers at Simulated, produced and published an unauthorized press release; and, in conjunction with Defendants Wilding, Koifman, Stock Street, Skyline, Tripod, Goldstein, Eisenberg, Asher, Kramer, Chui-Tiru, Noveshen, Bornstein, SCB and Associates, Envision Capital, as well as with other Defendants comprising Public and Investor relations Groups, began a massive sell-off of Simulated's stock that led to complete erosion of trust and confidence of the common shareholders.

178.    By the end of the day on Wednesday, May 25, 2011, Simulated's stock has traded over 170,000,000 (one hundred and seventy million) shares, as compared to 2 to 6,000,000 shares on any average day.

179.   In response to Watson's flagrantly deceptive and illegal actions, by the end of the day on Wednesday, May 25, 2011, Licht wrote (see Exhibit "S"),

> *"Ajene, I just have to express once again my disappointment concerning the press release. It is true that we worked together on drafting it; however, we did not agree on having it released. Furthermore, the steps we implemented to prevent this from happening were deliberately circumvented, which makes this appear as calculated abuse of our relationship. Please alert all individuals who are responsible for this action not to ever send-out a press release without our explicit approval."*

However, by this time, the damage to Plaintiff and Simulated was significant and irreversible.

180.   During the day on Wednesday, May 25, 2011, Watson was joined, in-person, by Noveshen and Bornstein in attempts to smooth over the damage. On the same day, Watson, Bornstein, and Noveshen met with Defendants Koifman and Wilding and orchestrated continuation of massive dumping of the shares, as well as strategy for division of ill-gotten profits.

181.   Subsequently, in October of 2011, Licht and other Simulated managers have realized that the Defendants have misrepresented their intentions and had no intent to help the company in obtaining funding or help in management in public relations campaigns.

182.   Once the entire scheme unraveled and the price of Simulated's shares plummeted, the individual street investors began to fault and personally accuse Plaintiff of mismanagement and impropriety. There were numerous posts on the internet and in open forums. Furthermore, the investors, outraged by the scheme, began inundating Plaintiff with e-mails and phone calls (see Exhibit "T").

183.   Plaintiff was injured in his personal business and personal property by Defendants' misrepresentations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants as set forth above. Such injury includes: the deprivation of the ability to conduct the Plaintiff's commercial activities on the basis of true, accurate, complete, and standard business practices; the loss of monies as a result of false, fraudulent, and/or misrepresented stock issuance requests, coupled with creation of illegal scheme to issue free-trading shares, opinion letters, and/or documents. Plaintiff was further injured due to the expenses incurred in payments made to others (i.e. transfer agent, accountants, postage, web development, etc.); and defamation.  The amount of damage is greater than $75,000; the actual amount is to be proven at trial.

184.   The relief sought by Plaintiff against Defendants includes compensatory damages, restitution for payments made by Plaintiff to others in reliance on Defendants' false representations, loss of income, applicable treble damages, costs of investigation and suit, interest and attorneys' fees (if Plaintiff retains an attorney in the future).

## COUNT I
### Fraud

185.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

186.   The representations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants, as set forth above, constitute false and fraudulent representations.

187.    Defendants intended that Plaintiff would be induced by such false and fraudulent representations to provide Simulated's shares of stock to Defendants and/or to other individuals.

188.    Plaintiff and/or others justifiably relied on these representations made by the Defendants as described in this Complaint, in authorizing stock issuance to Defendants and/or others in the belief that issuance was appropriate under applicable law and was not intended to decimate or injure Simulated or Plaintiff.

189.    As a result of the false and fraudulent representations by Defendants, Plaintiff suffered injury as set as described throughout this Complaint.

190.    The false and fraudulent representations by Defendants were made with malice, vindictiveness and wanton disregard for the rights of Plaintiff.

## COUNT II
### Fraud in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, 15 USC 78j and 17 CFR 240.10b-5.

191.    Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

192.    All Defendants, directly and indirectly, with scienter, including with recklessness disregard, in connection with the purchase and sale of securities (*SEC v. Zanford*, 535 U.S. 813 (2002)) by use of the means or instrumentalities of interstate commerce, or of the mails, have employed devices, schemes or artifices to defraud; have made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in

acts, practices or courses of business which have been and are operating as a fraud upon the purchasers or sellers of such securities.

193.   The statements made by Defendants, or omissions of material facts, are that they intended to invest in and manage business activity on behalf of the Company, for the purposes of generating interest in the Company amongst bankers and investors, as well as the investing public. Furthermore, Defendants misrepresented their intentions regarding disposition of Simulated's shares after acquisition, to the extent that they omitted to disclose their intention to sell their Shares aggressively into the market and their intention to dump all of the shares in a matter of days. All of these statements proved false or materially misleading given the context in which they were made.

194.   Plaintiff relied on these material misrepresentations and material omissions when entering into the transaction that resulted in, among other things, the issuance of shares to Defendants. Had Plaintiff known that the above statements were false or materially misleading, he would have rejected Defendants' stock issuance requests.

195.   Furthermore, had Plaintiff known that Defendants would sell all of the Shares within a few days and thereby destroy the value of the Plaintiff's shares and value of Simulated, he would never have entered into the transaction.

## COUNT III
### Violations of Securities Act of 1933
### Sections 5(a) and 5(c)

196.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

197.   During the relevant period, all Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities through the use or medium of a prospectus or otherwise when no valid registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

198.   Defendants Price and Tal had knowingly and deliberately issued false legal opinions in which they falsely asserted that Defendants had acquired shares from Simulated for investment purposes, rather than for resale; thereby enabling Defendants to obtain Simulated's shares without a restrictive legend or registration making shares available for immediate resale to the public.

199.   Defendants engaged in or participated in the unlawful distribution of securities as described above.

200.   By reason of the foregoing, Defendants, directly or indirectly, violated Sections 5(a) and 5(c) of the Securities Act [15 USC §§ 77e(a) and 77e(c)].

## COUNT IV
### Violation of RICO

201.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

202.    Plaintiff is a "person" within the meaning of 18 USC §§ 1961(3) and 1964(c).

203.    Each Defendant is a "person" within the meaning of 18 USC §§ 1961(3).

204.    At all times material to this Complaint, Defendants and/or other individuals were associated in fact and thus are an "enterprise" within the meaning of 18 USC §§ 1961(4) (hereinafter "the enterprise").

205.    At all times material to this Complaint, Defendants and/or other individuals engaged in "racketeering activity" by actively participating, among others, in the activity of "fraud in the sale of securities" within the meaning of 18 USC § 1961(1)(D).

206.    At all times material to this Complaint, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways and telephone lines.

207.    At all times material to this Complaint, each of the Defendants was associated in-fact although distinct from the enterprise.

208.    At all times material to this Complaint, each Defendant conducted or participated in the conduct of the enterprise's affairs and/or each Defendant had a role in directing or managing the operations or affairs of the enterprises.

209.    The Defendants who are associated in-fact were not acting in furtherance of the corporate Defendants' legitimate pursuits when committing acts of mail fraud and other wrongful acts as described in this Complaint.

210.   From at least 2009, Defendants devised and participated in a scheme to defraud Plaintiff and others as set forth above.

211.   Each Defendant conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, but not limited to, the multiple instances of mail and wire fraud as set forth above.

212.   These acts of fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 USC § 1961(5).

213.   The conduct of each of the Defendants constitutes a violation of 18 USC § 1962(c).

214.   Plaintiff and others were directly injured in their business and property by Defendants' violations of 18 USC §1962(c).

## COUNT V
### Conspiracy to Violate RICO

215.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

216.   Plaintiff is a "persons" within the meaning of 18 USC § 1961(3) and 1964(c).

217.   Each Defendant is a "person" within the meaning of 18 USC §§1961(3) and 1962(c).

218.   At all times material to this Complaint, Defendants and/or other individuals were associated in fact and thus are an "enterprise" within the meaning of 18 USC §§ 1961(4) and 1962(c).

219.   At all times material to this Complaint, Defendants and/or other individuals engaged in "racketeering activity" by actively participating, among others, in the activity of "fraud in the sale of securities" within the meaning of 18 USC § 1961(1)(D).

220.   At all times material to this Complaint, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways and telephone lines.

221.   At all times material to this Complaint, each Defendant was associated in-fact although distinct from the enterprise.

222.   From at least 2009, Defendants devised and participated in a scheme to defraud Plaintiff and others as set forth above.

223.   Each Defendant conspired and agreed among themselves and with other co-conspirators to violate 18 USC § 1962(c), that is to conduct or participate directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the numerous acts of mail and wire fraud as set forth above.

224.   These acts of mail and wire fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 USC § 1961(5).

225.   Said conduct constitutes a violation of 18 USC § 1962(d).

226.   Plaintiff and others were directly injured by the Defendants in their business and property as set forth above and described throughout the Complaint.

## COUNT VI
### Negligent Misrepresentation

227.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

228.   Defendants made and represented material fact to Plaintiff and others that they were accredited investors and business management experts.

229.   However, none of the Defendants were accredited investors or had education, experience, or expertise to assist businesses with funding or management.

230.   Defendants made the misrepresentations without knowledge as to its truth or falsity, or under circumstances, should have known of its falsity.

231.   Defendants intended that the misrepresentation induce Plaintiff and other to act and approve share issuance to the Defendants.

232.   In justifiable reliance on the negligently false information provided by Defendants, Plaintiff and others were directly injured by the Defendants in their business and property as set forth above and described throughout the Complaint.

## COUNT VII
### Concerted Tortious Action

233.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

234.    As described in paragraphs 124 through 184 of this Complaint, Defendants and/or others did various tortious acts in concert with each other.

235.    These tortious acts were committed pursuant to a conspiracy and scheme to defraud Plaintiff and others as set forth above.

236.    Defendant WATSON gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

237.    Defendant GIBBS gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

238.    Defendant NOVESHEN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

239.    Defendant BORNSTEIN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

240.    Defendant GOLDSTEIN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

241.    Defendant ISENBERG gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

242.   Defendant FREY gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

243.   Defendant STALLER gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

244.   Defendant KRAMER gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

245.   Defendant PRICE gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

246.   Defendant TAL gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

247.   Defendant KOIFMAN gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

248.   Defendant WILDING gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

249.   Defendant CHUI gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

250.   Defendant WATSON LLC gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

251.   Defendant ENVISION gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

252.   Defendant SCB gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

253.   Defendant TRIPOD gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

254.   Defendant VIRMMAC gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

255.   Defendant HERITAGE gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

256.   Defendant ASHER gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

257.   Defendant STOCK STREET gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

258.   Defendant SKYLINE gave substantial assistance and/or encouragement to the other Defendants and/or others to engage in the tortious acts as set forth above.

259.   The above described acts of Defendants, violate 18 USC §§ 1961(1)(D), 1962(c), 1964(c) and 1964(d) and also constitute fraud and caused Plaintiff and others harm as set forth above.

260.   The Defendants conduct was malicious and outrageous, as set forth above.

## COUNT VIII
### Conspiracy

261.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

262.   Defendants and/or others conspired together to engage in fraudulent actions that violated Florida Law as described in this Complaint.

263.   Defendants and/or others conspired together to commit fraud and tortious acts against Plaintiff and others as described in this Complaint.

264.   Defendants engaged in numerous overt acts in furtherance of this common purpose, including but not limited to, actions detailed in paragraphs 124 to 184.

265.   The Defendants conduct was malicious and outrageous as set forth in paragraphs 124 to 184.

266.   Plaintiff and others were damaged by the actions of the Defendants as set forth in paragraphs 124 to 184.

**COUNT IX**
**Unjust Enrichment**

267.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

268.   Defendants' retention of amounts received through the "pump-and-dump" scheme was wrongful because these monies were obtained as a direct result of fraud and other wrongful acts set forth in this Complaint.

269.   Plaintiff and others have been harmed by Defendants' acts in wrongfully obtaining and retaining these monies because Plaintiff would not have approved stock issuance if he had known at the time that Defendants acts were wrongful, fraudulent and/or illegal.

270.   Defendants' retention of these payments violates fundamental principles of justice, equity and good conscience.

271.   Additionally, Defendants' retention of money due to Defendants' fraudulent and wrongful practices as described in this Complaint is wrong and unjust.

272.   Plaintiff and others have been harmed by Defendants' misrepresentations.

273.   Defendants have been unjustly enriched and to allow Defendants to retain these amounts would violate fundamental principles of justice, fairness, equity and good conscience.

## COUNT X
## FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT VIOLATIONS

274.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

275.   Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 501.20 *et. seq.,* makes it unlawful for ". . . unconscionable acts of practices and unfair or deceptive acts or practices in a conduct of any trade or commerce." Specifically, Defendants have engaged in activities in the State of Florida and within this District which violate the statute by acting in concert and conspiracy with others to coerce Plaintiff and others, to unwilling participation in a "pump-and-dump" scheme. Specifically, Defendants: (a) failed to properly advise and inform Plaintiff and others, of their intent to engage in a "pump-and-dump" scheme, (b) failed to advise, inform or otherwise notify Plaintiff and others of their intent to artificially inflate the price of Simulated's stock and use Plaintiff's cooperation in doing so, (c) used Plaintiff's name in a website and public press releases to falsely induce the public to believe that Plaintiff is the one responsible for the "pump-and-dump" scheme, and (d) repeatedly deceived Plaintiff and others with unsubstantiated promises and assurances. Defendants' and their representatives'

actions are taken knowingly, intelligently and with a purpose to deceive or misinform street investors, as well as, Plaintiff and others.

276.   As a direct and proximate result of the activities and conduct in violation of Florida's Deceptive and Unfair Trade Practices Act, Plaintiff is an "aggrieved person" as defined by said statute and has suffered damages within the meaning of said statute.

277.   Plaintiff seeks to recover the actual and treble damages against Defendants as well as reasonable attorney's fees (if an attorney is retained in the future) and court costs under Florida Statutes §501.211 and §501.2105.

## COUNT XI
## Defamation

278.   Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

279.   The Defendants have defamed Plaintiff through the actions described above.

280.   Defendants intentionally kept Plaintiff on the frontlines of communications with general public. Defendants knew that their actions would tend to harm (and have harmed) Allen Licht's reputation so as to lower Licht in the estimation of the community and/or to deter third persons from associating or dealing with Licht.

281.   Defendants' actions have caused others to publish statements on the internet defaming Licht.

282.   The Defendants' actions have also slandered Licht.

283.    The Defendants' actions (both libelous and slanderous) clearly applied to Licht.

284.    The third party recipients or readers of the defamatory statements would (and have) understood that facts exist which indicate that Licht has engaged in fraudulent and/or otherwise improper and/or illegal conduct.

285.    The Defendants' defamatory actions impute to Licht conduct, characteristics, and/or a condition that would adversely affect Licht in his lawful business or trade.

286.    The Defendants' defamatory statements and actions were defamatory per se.

287.    The Defendants' actions as described above have also been designed to communicate and have communicated to the community the false allegation that Licht is or has engaged in fraudulent activity or other professional impropriety.

288.    Plaintiff has suffered actual damages and/or special harm including monetary and/or out of pocket loss caused by the Defendants' defamations.

289.    Licht has suffered general damages as a result of Defendants' defamations including loss of reputation, anxiety, emotional distress, and sleeplessness.

290.    Defendants acted negligently, recklessly, wantonly, willfully, deliberately, and/or maliciously.

291.    Defendants' conduct is not privileged. In the alternative, to the extent a privilege may apply, Defendants have abused that privilege.

## COUNT XII
### Restitution

292.  Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1 through 184 of this Complaint.

293.  When Plaintiff authorized stock issuance based on statements and documentation provided by Defendants, he did so under a mistaken factual belief.

294.  This belief was mistaken because the stock issuance requests, statements, opinion letters, and/or documents and/or representations submitted to Plaintiff were false, misleading, inaccurate and/or fraudulent.

295.  If Plaintiff had known the facts set forth in the preceding paragraphs, he would not have authorized issuance of stock to Defendants.

296.  Plaintiff is entitled to recover from Defendants, each of who have been unjustly enriched, in an amount equal to the amount of sold Simulated stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, demands judgment against all Defendants jointly and/or severally as follows:

a)  Awarding damages suffered by Plaintiff as a result of the wrongs complained of herein, together with appropriate interest in an amount exceeding $75,000.00 for every Count stated herein;

b)  Awarding Plaintiff compensatory damages, where appropriate, suffered as a result of the wrongs complained of herein;

c)  Awarding Plaintiff consequential damages, where appropriate, suffered as a result of the wrongs complained of herein;

d)      Awarding Plaintiff exemplary damages, where appropriate, suffered as a result of the wrongs complained of herein;

e)      Awarding Plaintiff punitive damages, where appropriate, suffered as a result of the wrongs complained of herein;

f)      Awarding Plaintiff treble damages, where appropriate, suffered as a result of the wrongs complained of herein;

g)      Awarding Plaintiff rescissionary damages, where appropriate, suffered as a result of the wrongs complained of herein;

h)      Declaring that Defendants have been unjustly enriched and imposing a constructive trust to recoup Defendants' unjust benefits and other assets for the benefits of the Plaintiff;

i)      Awarding Plaintiff litigation expenses, costs and disbursements and reasonable allowances for the fees of Plaintiff's counsel (if any) and experts, and reimbursement of any other expenses associated with this litigation; and

j)      Granting such other and further relief as the Court may deem just, proper, equitable, or warranted by applicable law.


Date:  January 30, 2013                    Respectfully submitted,


                                           _____
                                           Allen Licht, *pro se*
                                           1594 Shoreline Way
                                           Hollywood, FL 33019
                                           Phone: 754-777-8770
                                           Fax: 954-302-8736
                                           E-mail: allenlicht@hotmail.com